THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. FELIPE NIEVES RIOS, ALIAS UTITA, JOSE CRUZ,
ALIAS MAYARRE, JOAQUIN RODRIGUEZ AND GABRIEL
VEGA, DEFENDANTS-APPELLANTS.

Argued February 7, 1955—Decided March 7, 1955.

Mr. *Walter S. Anderson* argued the cause for appellant Rios.

Mr. *Albert E. Heal, Jr.,* argued the cause for appellant Cruz.

Mr. *Angelo A. DePersia* argued the cause for appellant Rodriguez.

Mr. *Joseph T. Sherman* argued the cause for appellant Vega.

Mr. *Mitchell H. Cohen,* Camden County Prosecutor, argued the cause for the State.

The opinion of the court was delivered by

WACHENFELD, J. Early on the morning of February 18, 1954 two men walked briskly into the luncheonette located at 229 Linden Street, Camden, New Jersey. The owner and operator of the small restaurant, George Booris, 69 years of age, was in charge at the time. Seven patrons were present having breakfast. When Booris opened the cash register behind the counter, one of the men who had entered inserted a coin in the music machine and then stood blocking the door with his left hand on the knob, holding a gun.

Any doubt about the purpose of their visit was quickly dispelled by the curt announcement: "We are going to take the money away from this old fool * * * Nobody go." The other bellowed forth: "Nobody move. This is a holdup."

Booris was commanded to raise his hands, and, according to the overwhelming testimony, did so, although Rios, who was pointing a gun at him, denies it. Booris muttered: "Why are you going to kill me? Take the money but do not kill me." Despite his pitiful plea and his obedience to the command, Rios in cold blood shot him three times while he was standing within 10 or 12 inches of him.

When the owner was prostrate on the floor, Rios rifled his pockets, and he and Cruz, the other man, then emptied the contents of the cash register, containing $21, which was subsequently divided among the defendants, with the exception of Vega.

The victim was removed by the police to the Cooper Hospital in Camden. Emergency operations were performed but without avail. Three days after his admission, and on February 21, he died. The post-mortem examination and autopsy indicated there were 11 wounds altogether caused by bullets, two entering the back. The cause of death was attributed to multiple bullet wounds, shock and hemorrhage.

Intensive investigation by the police quickly revealed, and it was adequately established at the trial, that the plot to hold up and rob the luncheonette had been conceived months before its execution. The restaurant and its proprietor were known to Cruz and Vega, who frequented it on many occa-

sions, while Rodriguez was seen there two weeks before the commission of the offense.

A fellow countryman of the defendant and a friend of many years' standing testified that Vega, with whom he was sharing a room, informed him he intended to hold up the luncheonette and invited Calavira, the witness, to join in the enterprise. This conversation took place some two months before the holdup was actually effected.

On February 5, 1954 the same witness, together with the defendants Cruz, Rodriguez and Vega, made a trip to Chicago in an automobile owned by Rodriguez, and on the return route there was again a discussion concerning the holdup of the same place. All three defendants talked about it, agreeing to participate and to use Rodriguez' car. The witness testified: "Gabby said that 229 Linden is a good place to make a holdup because it was an old man and cash checks and got a lot of money in there," while Cruz and Rodriguez were quoted as saying: "They going to do the job."

Following the Chicago incident, the same witness, Calavira, and Vega went to New York, where all four defendants met. On the Tuesday prior to the commission of the offense, Vega told him that further plans had been made by Cruz and Rodriguez, and Calavira was again invited to join the holdup, which he declined.

On the night preceding the event, after they had gone from Camden to New York, as hereinafter set forth, Vega visited the witness, Calavira, in his room and told him that Rodriguez and Cruz were waiting downstairs and he, together with Rodriguez and Cruz, was going to hold up the premises at 229 Linden Street with the use of Rodriguez' car and a car he was to operate. For the third time the witness was solicited to join the enterprise and he again refused.

Vega told Adolfo Flores, another witness for the State, on two occasions preceding the holdup that the proprietor of this luncheonette was a good prospect.

On Wednesday night, February 17, 1954, the three defendants, Rios, Cruz and Rodriguez, came to the City of Camden from New York in Rodriguez' automobile, a black

Ford bearing Illinois license tags. Rios and Rodriguez were armed with guns and upon arriving in Camden all three immediately went to the luncheonette located at 229 Linden Street, where they met Vega. All the defendants were at the luncheonette at this time, and one of the State's witnesses overheard Cruz say to the other defendants: "This guy, he got a lot of money; the old man got a lot of money; he cash checks for the customers * * * he is good for shooting."

There were many witnesses who testified to the defendants' presence in the luncheonette on this occasion, and the evidence indicates that if the proprietor had been present the holdup would have been attempted. But he was not there, and accordingly it was planned to stage the robbery the following morning. Vega attempted to make arrangements for the sleeping accommodations of the other three defendants in the house in which he lived, but the owner "threw" them out and refused them admittance to Vega's room.

Vega slept with Alonzo Suggs, despite the fact that he had his own apartment. At about 3 A. M. on the morning in question, Vega left the home of Suggs and returned to the location where the other three defendants were sleeping in Rodriguez' car under a railroad bridge in Camden. He then returned to Suggs' home and about 6 A. M. on the same morning left Suggs' room with Suggs' automobile, which was seen on the morning of the holdup about one-half block from the luncheonette. It was also seen later that morning being driven around the luncheonette about five minutes before the crime was committed.

Sometime between 7 and 8 A. M. the other three defendants, Rios, Cruz and Rodriguez, left the place where they had been sleeping and proceeded in Rodriguez' car to the luncheonette. It was agreed that if the victim arrived at his restaurant in his automobile he was to be held by Cruz and robbed by Rios and Rodriguez was to be waiting in his automobile with the motor running for the purpose of a get-away.

Booris, however, did not arrive as anticipated in his own car but instead came in a taxicab, apparently empty-handed. The plan accordingly was changed and Rios and Rodriguez

entered the premises. Rodriguez gave a gun to Rios and they agreed he was to jump over the counter and grab the victim while Rios took the money. This plan, too, was abandoned and both defendants left the luncheonette and proceeded to the parked automobile, where Cruz was waiting.

The final plan agreed upon and executed resulted in Rios, preceded by Cruz, re-entering the luncheonette, both armed with guns, where they completed the holdup and shot the proprietor, as already narrated.

The day following the holdup, Cruz, frequently referred to throughout the trial as Mayaree, and Rodriguez were apprehended in New York City and returned to Camden. On March 2, Vega, often called "Gabby" during the trial, was arrested in the City of Camden and kept in custody. On April 5, Rios, referred to at times as Utita, was arrested in New York and returned to this State.

There is a conflict in the views of the different defendants as to many of the details and incidents as recited, but by and large the above is a fair resume of the over-all picture of the factual developments as they occurred.

The facts as they relate to two of the defendants who claim the verdict was against the weight of the evidence will again be dwelt on when that issue is disposed of.

All four defendants were indicted for murder (of which more hereafter), tried and convicted, the jury returning a verdict of murder in the first degree as against the defendants Rios, Cruz and Rodriguez, without a recommendation, resulting in the imposition of the death penalty.

Vega was found guilty of murder in the first degree with a recommendation of life imprisonment at hard labor, and such sentence was accordingly imposed upon him.

All four defendants appeal, each represented by different counsel and each relying upon his separate oral argument and brief. The respective briefs raise a multitude of different points, some of which are common to all, others applicable only to a particular defendant. For the purposes of clarity and convenience, we shall group the objections raised under several broad headings as indicated hereafter.

## Point I.

Was there error in denying the motions for severance?

Prior to the commencement of the trial, the defendants Rios and Rodriguez moved for a severance of trial as to each of them, which motions were denied by the trial court. These defendants, and also the defendant Cruz, who did not make such a motion, assign error in the court's ruling. Rios' motion was predicated on the hypothesis that having fired the fatal shots, he would be prejudiced by the admission in evidence of statements or confessions of his co-defendants, who would naturally seek to magnify Rios' culpability while minimizing their own participation in the crime. It was urged that the prejudicial effect of this evidence could not be successfully overcome by any form of cautionary instructions the court might make to the jury and therefore Rios should be granted a separate trial.

Although he entertained no hope for an acquittal at the hands of the jury, it is asserted Rios was nevertheless entitled to have the jury consider all the evidence for the purpose of determining whether they should recommend life imprisonment, *State v. James*, 96 *N. J. L.* 132 (*E. & A.* 1921); *State v. Barth*, 114 *N. J. L.* 112 (*E. & A.* 1934); *State v. Jefferson*, 131 *N. J. L.* 70 (*E. & A.* 1943), and that the statements of the other defendants would cause the jury to reject Rios' explanation of the manner in which he became involved in this nefarious affair. Counsel argues thusly:

"Had those denials stemmed from an honest purpose to dispute an untruthful statement, no quarrel could here arise. But since it is patently clear that such denials were the product of antagonistic defenses dictated by the awesome necessity which haunted the defendants Cruz and Rodriguez, it was gravely prejudicial to the defendant Rios that they were heard by the same jury which passed upon the fate of all three defendants."

The defendant Rodriguez also sought a severance below, but the argument he offered was quite the reverse of Rios'. Rodriguez claimed that at a joint trial on the theory of conspiracy, Rios' confession, in which he acknowledged his own

guilt and implicated his co-defendants as participants in the robbery, would cast the burden of Rios' guilt upon him. It was said that the confession, which was admitted in evidence at the trial, would not be admissible if the defendants were tried separately.

To be sure, the reasons advanced by Rodriguez for a severance of trial as to him undermined the validity of Rios' motion, for it is difficult to perceive how Rios could have been damaged by the confessions or statements of others, when he had already confessed his complete guilt to the crime and concededly the confession was admissible against him.

The State bristles in reply to these contentions and vigorously contends it needed no assistance from any statements or confessions of the defendants to convict Rios or, indeed, any of the other three defendants. The State claims it had other evidence ample to convict all the defendants and that its case was strong enough to rest on its own foundation. It asserts in its brief, and it was not disputed at oral argument:

"Eight eye witnesses testified to the robbery and shooting; thirteen as to the events on the night before; ten as to the flight and after events and sixteen as to other details. All were produced by the State."

Provision is made for the granting of a severance in a criminal cause in *R. R.* 3:5–7, which provides that if either party, the State or the defendants, is prejudiced by joinder of more than one defendant in an indictment, the court *"in its discretion"* may order a severance or *"whatever other relief justice requires."*

■ The above rule is but declaratory of practice long settled in this State. See *State v. Nixon*, 86 *N. J. L.* 371 (*E. & A.* 1914) ; *State v. Tonghanni*, 96 *N. J. L.* 63 (*Sup. Ct.* 1921); *State v. Juliano*, 103 *N. J. L.* 663 (*E. & A.* 1927) ; *State v. Treficanto*, 106 *N. J. L.* 344 (*E. & A.* 1929) ; *State v. Giampietro*, 107 *N. J. L.* 120 (*E. & A.* 1930) ; *State v. Dolbow*, 117 *N. J. L.* 560 (*E. & A.* 1937), appeal dismissed, 301 *U. S.* 669, 57 *S. Ct.* 943, 81 *L. Ed.* 1334 (1937).

It is likewise the rule prevailing among almost all American jurisdictions. See the cases collected in the annotation in 70 *A. L. R.* 1171–1186, where the rule is stated as follows (at *page* 1172) :

"* * * Any of the defendants who fears that his defense may be prejudiced by a joint trial may apply to the court for a severance, the granting of which is not a matter of right, but rests in the sound discretion of the court, to be exercised solely in the interests of justice."

We are confident that no abuse of discretion was committed in denying the motions for a severance. This is not a case in which each defendant insisted the other defendant did the actual killing. There is no dispute in that regard. Rios is the one who pulled the trigger, and the fundamental facts are not disputed except as to a phase of direction and compulsion sought to be inserted by Rios.

The record indicates quite revealingly that a severance and a separate trial for each of these defendants would have created almost insurmountable problems and would have made such a course incompatible with the due administration of criminal justice.

Moreover, the court in the case *sub judice* gave ample and complete instructions to the jury to the effect that the statements made by a particular defendant would not be binding upon other defendants and should be so limited. For example, before Vega's statement was introduced into evidence, the court specifically charged :

"A statement of a defendant is only admissible and limited as evidence against the party who made the statement. * * * You are to consider this alleged statement in determining the guilt or innocence of the defendant who made it as it is only evidence against the person who is alleged to have made the statement and it cannot be used as evidence against the other defendants in any way."

And, prior to the introduction of Rios' confession and again at the conclusion of both Rios' and Vega's confessions, the court employed similar language :

"In the consideration of alleged statements of Rios and Vega, as I have cautioned you many times during the trial and now instruct you, the statement made by any defendant is only evidential as to what he says he himself did or said, not against any other defendants as to what he said such other defendant or defendants who didn't make the confession did or said. I think we must by now understand each other on this point."

In fact, the record indicates that on nine distinct occasions the court cautioned and instructed the jury as to the limitation to be placed upon the individual defendants' statements, and it is significant that on no occasion did any of the counsel for the defendants object to the content of the instructions that were given or suggest additional instructions.

The cases cited and relied upon by defendant Rios in his brief do not support his position. In *Day v. State*, 196 *Md.* 384, 76 *A.* 2d 729 *(Ct. App.* 1950), a severance was directed where each of the two defendants on trial had made statements accusing the other of having committed the crime, the court noting that it would be practically impossible for the jurors to dismiss from their minds the cross-accusatory statements. As we have already noted, there was no such dispute here. It was conceded by all that Rios had fired the fatal shots.

*State v. Leaks*, 124 *N. J. L.* 261 *(E. & A.* 1940), is factually dissimilar and has no applicability to the case at hand.

## Point II.

### *Was error committed by the court during the voir dire?*

#### A.

##### *The court's refusal to exclude accepted jurors from the courtroom during the voir dire.*

After the first juror had been accepted and sworn, a motion was addressed to the trial court asking for the removal of such juror and all jurors subsequently sworn from the courtroom during the interrogation of the remaining veniremen.

The basis of the motion was: (1) selected jurors would hear statements made by other prospective jurors which would tend to implant in their minds notions concerning the case to be tried which would not be properly evidential, and (2) the audition of such remarks or statements might establish in the minds of the accepted jurors some prejudice or prejudices against the defendants.

The application was denied and each juror sworn was permitted to occupy a seat in the jury box during the remainder of the *voir dire*. A large number of jurors were examined and there appears as part of the record an analytical chart prepared by counsel which purports to show the extent to which such jurors already selected were permitted to hear expressions by other members of the panel who were being interrogated as to their qualifications.

Admitting there is no precedent for their position in this jurisdiction, defendants turn to Texas, where, in *Gunn v. State*, 90 *Tex. Cr. R.* 209, 234 *S. W.* 399, 400 (*Sup. Ct.* 1921), apparently such relief was granted. No other adjudications supporting this disposition have been submitted. Counsel, however, asserts that although we have no decisions dealing with this problem here, there are pronouncements which inferentially support his position. He points to *State v. O'Leary*, 110 *N. J. L.* 36 (*E. & A.* 1933), also a case in which the life of the accused was at stake. There the court stated (at *page* 39) :

"* * * the sequestering of the jury during the continuance of the trial is a 'requisition of absolute law, and is not, in any measure, a matter resting in the discretion of the court.' A rule of procedure rooted in tradition and precedent, devised for the protection alike of society and the accused, should not be set aside unless the reasons which gave it vitality no longer obtain. This is not the case here. The considerations which gave it existence are as cogent and compelling to-day as when it first took form."

The opinion quotes from *State v. Hornsby*, 8 *Rob.* 554, 41 *Am. Dec.* 305 (*La.* 1844), wherein the rationale of the practice of sequestration of jurors is stated as follows (110 *N. J. L.*, at *page* 39) :

"* * * 'This precaution is necessary to protect the accused from any undue influence which may be exercised upon the members of the jury, even without their knowledge, and cannot be tortured into a disparagement of their integrity. Improper impressions may and will be made upon their minds by artful and designing men, of which they may be perfectly unconscious; neither can they shut their ears to the expression of popular opinion.' To which should be added that society is entitled to protection from improper influences that may be exerted upon jurors in cases of such great moment."

From this it is argued that if in a capital case jurors must be shielded from hearing expressions of popular ill will toward the accused during the trial emanating from outside the courtroom, it is inconsistent to constitute them a "captive audience" to listen to similar expressions during the *voir dire*. It is said that the admonitions by the court to disregard such remarks are ineffective to extirpate from their memories the objurgations uttered in their presence.

Contrasted to this theory is the admitted fact that no rule of court, no statute, no judicial decision requires, directs or even suggests directly or otherwise the removal of "accepted jurors." The procedure followed in the instant case was in accord with the custom followed here from the time when "memory of man runneth not to the contrary."

The distinction between a jury's hearing expressions made in a courtroom during part of a trial and being subjected to expressions from certain of the public who might well be prejudiced because of the perpetration of a crime of extreme violence is quite marked.

As to any incident which may occur within the courtroom, the court has an opportunity to assess the possible prejudice resulting and is in a position to provide protection for the accused by declaring a mistrial, if necessary, or through its admonitions to the jury.

Obviously, such protection cannot be provided with respect to incidents which occur outside of the courtroom. History is replete with capital cases where the public feeling was at extreme heights. On these occasions a proper endeavor should be made in the application of our judicial procedure during the trial to neutralize the prejudicial effects.

■ Moreover, while the jurors who have been selected may be subjected to statements of disqualified veniremen during the *voir dire,* it is also during this very process of selecting a jury that an active attempt is made to impress upon the jurors our fundamental notion of trial by a fair and impartial jury, an endeavor which is participated in by counsel for each side and the court itself. In other words, the educational process works both ways, and on balance, we cannot say that the time-honored practice which was followed here worked to the prejudice of the defendants.

■ Even if the contrary view were accepted, still we are satisfied that any possible harm to the defendants was averted by the court's instructions to the jury at the completion of the *voir dire* as follows:

"Now, having completed the selection of the jurors, I hereby instruct you jurors that you should completely disregard and eliminate from your minds any and all questions, answers and expressions of opinion that may have been heard by you during the examination of the prospective jurors. I further instruct you that from this point on you are to determine the case and reach your verdicts or verdict solely upon the evidence presented to you by the State and by the defendants and upon the law as it will be given to you by the court at the completion of the case."

And again in its final charge to the jury the court said:

"Let me say to you that no article which may have appeared in any newspaper or anything that you may have read or heard about this case before your selection as a juror cannot and should not be considered by you in the determination of this case; that you also are to completely disregard and eliminate from your minds any and all questions, and answers and expression of opinions that you may have heard during the examination of the prospective jurors."

There can be no question but that this jury was thus adequately admonished to consider the case upon the evidence alone, a duty which they were sworn to do and which they had stated under oath they were capable of performing. Accordingly, we find no merit in the suggestion of error in the trial court's refusal to exclude the sworn jurors during the *voir dire.*

## B.

### *The remarks of the court to prospective jurors in the presence of the accepted jurors.*

During the *voir dire* the court propounded questions to prospective jurors who avowed their opposition to capital punishment. It is contended that the import of the interrogation was prejudicial to the defendants because it may have conveyed to the jury the impression that the trial judge expected the return of a verdict which would require the imposition of a death penalty, and because it may have inculcated in the juror's mind some compulsion to return such a verdict on pain of censure by the court.

The questions objected to were obviously posed in an effort to elicit necessary information to enable the court to rule properly upon challenges made or contemplated. Nowhere can it be said that the court gave the impression that the jurors were under a moral obligation not to return a recommendation which would have meant the elimination of the extreme penalty. The questioning, rather, was directed to whether religious or moral scruples would prevent the individual juror, under any circumstances, from deciding upon a verdict with the death penalty if the evidence so required.

We subscribe to the oft-repeated pronouncement that everyone charged with crime has an absolute constitutional right to a fair trial in an atmosphere of judicial calm, before an impartial judge and an unprejudiced jury. However, we fail to see that the trial court's interrogation violated any of these fundamental requisites. It is well settled that no impropriety is committed in asking a prospective juror whether he would be dissuaded from bringing in a first-degree murder verdict if he knew that the penalty would be death. *State v. Bunk*, 4 *N. J.* 461 (1950). Since the crime of which the defendants were accused carried the death penalty, the trial court could properly ascertain whether prospective jurors were unable, because of their scruples, to render a verdict requiring capital punishment. The State is entitled

to a jury which is not prejudiced against its established laws and statutory enactments. The questions propounded by the trial court were necessary and were designed only to elicit this information. No error was committed in reference thereto.

## C.

### *The State's examination of veniremen upon the voir dire.*

In line with their objection to the court's interrogation of prospective jurors as to their ability to return a verdict requiring the death sentence, the defendants also object to similar questions to the veniremen by the prosecutor and the systematic exclusion of all jurors whose answers indicated that they did not believe in capital punishment.

■ This is substantially the same argument already advanced and disposed of under B, *supra*, and in so far as the State's interrogation of the veniremen is concerned, we need note only that it has "a right to ask for the death penalty and to inquire as to a prospective juror's attitude respecting the imposition of that penalty." *State v. Bunk, supra*, at *page* 468.

However, counsel contends that prejudicial error was committed in permitting the State "by this method to select only jurors who could impose only the death verdict against all four of these defendants," and "this gave the State the right of selection of a special class of jurors who by their answers had practically pretold their judgment of the defendants both as to guilt and punishment."

■ The State is, of course, not entitled to a "special class of jurors" who come within the specification cited, and, if these contentions correctly portray what actually took place, palpably there would have been glaring error requiring a reversal.

■ The record, however, does not substantiate such a situation. Rather, the record shows nothing more than an attempt by the State to eliminate from the jury those who

were unable to render a death verdict, which, as we have already noted, was within the State's prerogative. Certainly, the method employed did not bring forth "only jurors who could impose only the death verdict against all four of these defendants," as is evidenced by the verdict against Vega, which included a recommendation of life imprisonment.

To repeat, we find nothing in the questions propounded which would have given the prospective jurors the impression that it was their duty to sentence these defendants to death. It was merely a proper probing within judicial limits to ascertain if their beliefs and convictions would permit the return of a verdict in accord with the present law of our State.

## D.

*The denial of the challenge for cause of the venireman Paul R. Spaeth.*

Rodriguez assigns as error the trial court's denial of his motion to excuse the venireman Spaeth for cause. The record discloses that his counsel subsequently exercised his last peremptory challenge against this venireman.

Assuming the denial of the challenge for cause was erroneous, it is still well settled that no ground for a reversal is presented if the juror was challenged peremptorily and the defendant's challenges were not exhausted at the conclusion of the selection of the jury. *Drake v. State*, 53 *N. J. L.* 23, 33 (*Sup. Ct.* 1890); *State v. Morehous*, 97 *N. J. L.* 285, 288 (*E. & A.* 1922). While Rodriguez expended his last peremptory challenge to remove Spaeth, the record shows every subsequent challenge for cause made by him was honored by the court and no objection whatever was stated to the jurors who were actually selected. Indeed, in almost all instances he expressly stated on the record they were acceptable to him. Assuming error, it was harmless. See *State v. Deegan*, 133 *N. J. L.* 263, 268 (*E. & A.* 1945):

"Inasmuch as defendant offered no objection to any juror drawn after exhausting his challenges, but expressed approval and satisfac-

tion as to each juror thereafter drawn and sworn, it is apparent that he suffered no injury by the rulings of the trial judge with respect to questions propounded to prospective jurors, or with respect to the excusing or failure to excuse jurors for cause. Defendant made no objection to or motion with respect to any of the jurors sworn."

## E.

### *The refusal to permit further interrogation of a sworn juror or to permit such juror to be challenged peremptorily.*

Defendant Rios assigns as error the refusal of the trial court either to permit him to conduct a further *voir dire* examination of the juror Nix or to exercise a peremptory challenge to this juror after he had already been found acceptable to defense counsel and sworn.

Assuming, *arguendo*, under *R. R.* 3:7-2(*b*) a re-examination of a juror already sworn may be had, the allowance of such a re-examination, however, rests solely in the discretion of the trial court. Without reciting the factual situation which prompted the court's ruling here, we are agreed from the record there was no abuse of discretion shown.

Defendant also urges *R. R.* 3:7-2(*b*) has effected a change in our long-standing rule that peremptory challenges cannot be made after a juror is sworn. *State v. Lyons,* 70 *N. J. L.* 635 (*E. & A.* 1904); *State v. Schmieder,* 5 *N. J.* 40 (1950); *State v. Grillo,* 16 *N. J.* 103 (1954).

Our rule in this respect was the common-law rule and is today the prevailing practice among the majority of American jurisdictions. See *DeCarlo v. Frame,* 134 *Conn.* 530, 58 *A. 2d* 846 (*Sup. Ct. Err.* 1948); 31 *Am. Jur.* 699; 3 *A. L. R. 2d* 504, 512.

*State v. Grillo, supra,* was decided after the adoption of *R. R.* 3:7-2(*b*), but in so far as it appears from the opinion, the effect of the new rule was not argued or considered there. Be that as it may, we find nothing in the language of *R. R.* 3:7-2(*b*) warranting a departure from our prior practice with respect to the timing of peremptory

challenges. The context clearly shows that only challenges for cause may, within the discretion of the court, be made after the juror has been sworn, and there are sound reasons underlying the distinction drawn.

Were we to sanction peremptory challenges after the swearing of the jurors, it would soon become standard practice for counsel to withhold their peremptory challenges until a full panel had been sworn, doubtlessly hoping thereby to gain the advantage of an observation made after the entire panel had been selected. Such a procedure would lead to but further and needless delay in the selection of a jury and would not serve to advance the ends of justice.

## POINT III.

*Was error committed in the court's rulings
concerning the admission of evidence?*

### A.

*Permitting a physician to testify as to the result
of a post-mortem examination and as to the
cause of death.*

The county physician who performed the post-mortem on the victim was ill at the time of the trial and was not available as a witness. Dr. Read, chief pathologist of the Cooper Hospital in Camden, had assisted in the performance of the post-mortem and he testified as to the cause of death based on what he had observed at the time.

It is urged there was not sufficient identification of the body on which the autopsy was performed. This point was not made at the trial and is being urged for the first time here.

A perusal of the record indicates it has no merit. Identification was abundantly proved by the coroner and by Dr. Hunsiker, resident physician, who had treated Booris for days before his death.

However, it is said that the testimony of Dr. Read should have been excluded since under *N. J. S. A.* 40:21–24, 25,

26.6 and 26.7 the county physician, when there is one elected and qualified, has the exclusive right to make all views and inquiries heretofore made by coroners and to determine the cause of death of a person who comes to his death by murder.

It should be noted that no objection is or could be made to the doctor's qualifications as an expert to testify as to the cause of death. He had himself performed more than 4,000 autopsies and was eminently qualified from the standpoint of background and experience to testify in the instant case. Moreover, he testified from direct observation made while he was assisting in the performance of the post-mortem.

 The scope and purposes of the statutory scheme upon which defendants rely quite plainly have nothing to do with the question before us. The statutes referred to above simply deprive coroners and justices of the peace from the rights and powers formerly vested in them to make views, inquiries and investigations into the cause of death in certain enumerated cases, and install them exclusively in the county physician. Thus, it was intended to do no more than settle the obligations and duties as between these classes of officials. We have searched in vain, however, to find any prohibition therein which would prevent a duly qualified physician from testifying as to what he observed while he was assisting or was present with the county physician when the latter was performing his official duties.

If we place the shoe on the other foot and test its logical consequences, it will become quite apparent why the interpretation advanced by the defendants is wholly impractical and not in accord with the intendment of the statute. Thus, assume the defendant had ascertained that Dr. Read had concluded from his observation that the county physician was gravely in error and instead of death being caused by gunshot wounds it was occasioned by heart failure unrelated to trauma; can there be any doubt that he could have so testified if called by the defendants for that purpose? To ask the question is to answer it.

B.

*The admission of the testimony of the witnesses Calavira, Suggs and Flores concerning statements made by the defendants prior to the actual holdup.*

The State's witness, Calavira, testified that on an automobile trip from Chicago to Camden with the defendants Rodriguez, Mayaree and Gabby certain conversations took place among them about a contemplated holdup, presently the basis of the indictment returned by the grand jury. It is argued the conversations were so far out of time as not to be admissible as part of the *res gestae* and that they should have been excluded because they did not show any agreement or combination and were irrelevant as they related to the charge of robbery.

The testimony of two other State's witnesses, Suggs and Flores, is similarly classified.

No authorities are furnished to sustain the defendants' point of view, nor do we see any merit to the argument advanced. The conversations in question took place among three of the defendants and were, in fact, the foundation of the conspiracy itself. They occurred in the presence of Calavira, who was solicited then, as well as on two other occasions, to join the enterprise, so that what was uttered can easily be construed as being in furtherance of the conspiracy formed by the defendants.

 The acts and declarations of any conspirators in furtherance of the common design may be given in evidence against any other conspirator. The rule is applicable where it is charged that a crime was committed in pursuance of a conspiracy, whether or not the indictment contains a count for such conspiracy. *State v. Carbone*, 10 *N. J.* 329, 338 (1952).

 Additionally, most of the testimony objected to within this class was clearly admissible as admissions against interest.

## C.

### *The admission of testimony of the State's witnesses for purposes other than stated in the bill of particulars.*

Two of the defendants, in slightly different phraseology, assert the State submitted a bill of particulars stating the names of witnesses upon whom it would rely to establish the defendants' presence at the scene of the offense. Having thus been dedicated to a specific purpose in the bill of particulars, it is now maintained that other testimony of these witnesses outside that specific limitation was inadmissible and error.

The defendants' objection is best visualized by what occurred with the witness Quattrocchi. He testified to certain things that happened on the day of the holdup at 9 A. M., but, having been mentioned in the bill of particulars as one of the witnesses who would be relied on by the State to prove the defendants' presence at the scene of the crime at 8 A. M., it is claimed the additional testimony of what happened at 9 A. M. was wholly inadmissible, and what is more, its admission was reversible error and ground for a mistrial, and all this regardless of what the testimony was or its import.

The only authority supplied is the rule itself, *R. R.* 3:5–9, which imposes no such limitation. Not only is the authority for this suggestion lacking, but there is not even the semblance of logical reasoning indicating why it should prevail and how it would constitute error so prejudicial as to be reversible. The argument falls of its own weight.

## D.

### *The admission of evidence during the State's direct case rebutting the anticipated alibi of the defendant Vega.*

Vega relied on an alibi as his defense. In the State's case, Alonzo Suggs, William Suggs and Emma Suggs testified for the State, and Vega now contends their testimony disproved

his alibi. He further asserts it "deprived the defendant of the benefit of reasonable doubt \* \* \* to which he was entitled."

The substance of their testimony was that Vega brought Alonza Suggs' automobile to the latter's home at about 12:30 A. M. on the morning of the crime and requested permission to spend the rest of the night there. At about 6:30 A. M. they discovered Vega and Alonzo's car were gone. At about 10 A. M. Vega returned with the car, and he then told Alonzo if anyone asked whether he (Vega) had been out of the house to tell them he had not, and said: "If you tell anybody I have been off the place, I will kill you." Vega remained at the Suggs home until the detectives came for him.

The record, by inference at least, indicates these witnesses had been subpoenaed by Vega in the hope they would substantiate his alibi. This additional information, however, is of little help in ascribing any merit to the argument which the defendant now advances. Their testimony was clearly relevant and material, for it traced the activities of the defendant immediately before and after the crime and eliminated almost *in toto* the defendant's false alibi. Their names were included in the amended bill of particulars furnished by the State, and certainly the State had as much right to call them as witnesses in its behalf as did the defendant. No party, criminal defendant or otherwise, has an exclusive right to any particular witness.

We do not perceive any merit to the contention that the result of the State's calling these people as witnesses was to shift the burden of proof from the State to the defendant.

### E.

*The denial of the motion to strike the testimony
of the witness Vasquez.*

The defendant Rodriguez says the State, by leading questions containing the desired answers, obtained responses from the witness Vasquez which were prejudicial. In the next

breath he asserts: "The witness Marcelino Vasquez in his testimony did not testify to any material fact in spite of the leading questions asked by the State."

Assuming the truth of the last hypothesis made by the defendant, it is axiomatic that no error prejudicial to him could therefor have occurred.

 Resorting to the record, however, the factual situation appears otherwise than as conceived by counsel. Vasquez identified Rodriguez as having been in the decedent's restaurant together with Vega on the night preceding the crime. The purpose of his testimony was to show both these defendants had visited and were familiar with the restaurant which was robbed on the following day. It had a direct bearing upon material elements of the crime charged. Its admission was proper and there was no error in refusing to strike it.

F.

### The admission in evidence of Vega's statement of March 2, 1954.

On March 2, 1954, following his apprehension by the police, Vega made a statement to them which was transcribed by a court stenographer. When that statement was spread upon the record, not only was there no objection to it by his counsel, but it was specifically conceded that it was voluntarily made. Counsel said: "I have just spoken to the defendant Gabriel Vega and he informs me that there will be no objection to the introduction of that as to the voluntary part of it."

On appeal, counsel reverses his stand and now says the statement should not have been admitted.

 Not having been advanced below, it cannot be argued here. *Schwartz v. Rothman*, 1 *N. J.* 206 (1948); *Fischetto Paper Mill Supply, Inc., v. Quigley Co., Inc.*, 3 *N. J.* 149 (1949); *State v. Pierce*, 4 *N. J.* 252 (1950); *State v. Taylor*, 5 *N. J.* 474 (1950). Nevertheless, relaxing our rule in this respect and giving the point its full worth, we note the defendant first urges the facts admitted do not constitute

guilty participation or aiding or abetting in the robbery committed.

We cannot agree. His confession was sufficient proof of his guilt and raised a question requiring submission to the jury.

Next it is said: "Since this statement was never signed and not acknowledged to anyone in authority to be a true statement, it was therefore absolutely inadmissible," citing *State v. Cleveland*, 6 *N. J.* 316 (1951); *Roesel v. State*, 62 *N. J. L.* 216 (*E. & A.* 1898).

These cases do not support the view for which they are submitted. The confession was oral. It was taken stenographically by an official court stenographer. The State did not offer a transcript of the confession, but the transcriber of it testified orally from his shorthand notes, such testimony being clearly competent and admissible. In *State v. Cleveland, supra,* 6 *N. J.,* at *page 329,* we said:

"We think the rule is clearly spelled out in these cases that until the statement is signed or its correctness acknowledged in some fashion by the defendant, it constitutes merely a memorandum of what was said and is inadmissible in evidence. In such cases, the State is limited to the oral testimony of witnesses who were present when the statement was made. They may, for the purpose of refreshing their recollections, where necessary, refer to notes made at the time by them, or under their supervision."

In the case *sub judice,* although the statement was not signed, "its correctness" was specifically acknowledged by the defendant, who had been made fully aware of its contents and import, and the treatment accorded the evidence was in strict compliance with the rule laid down in the *Cleveland* case and we are unable to ascertain error in its admission.

The test is whether the confession given, under the circumstances, was voluntarily made. Its competency is primarily for the trial judge, and the weight to be given it is determined by the jury. The determination of the trial judge will not ordinarily be disturbed on appeal where there is sufficient evidence to support it. *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1948); *State v. Auld,* 2 *N. J.* 426, 435 (1949);

*State v. Pierce,* 4 *N. J.* 252 (1950); *State v. Cooper,* 10 *N. J.* 532 (1952); *State v. Grillo,* 11 *N. J.* 173 (1952); *State v. Walker,* 15 *N. J.* 485 (1954); *State v. Beard,* 16 *N. J.* 50 (1954).

■ As to the insistence that the confession "to be admitted into evidence must be made to one in authority," our law is quite to the contrary. *State v. Hand,* 71 *N. J. L.* 137, 139–140 (*Sup. Ct.* 1904), specifically provides that a confession may be taken by anyone.

■ "Another objection to this evidence was that the admission was brought out in answer to a question by the justice which he had no right to ask. But the settled rule is that a confession is admissible, though it is elicited by questions, whether put to the prisoner by a magistrate, officer, or private person, and the form of the question is immaterial to the admissibility, even though it assumes the prisoner's guilt. 1 *Greenl. Ev.* 229; *Roesel v. State,* *supra.*"

## G.

### The court's instruction to the jury during Rodriguez' cross-examination of Rios.

Counsel for defendant Rodriguez during his cross-examination of his co-defendant Rios sought to establish that Rios had made statements in his confession which were inconsistent with his testimony at the trial and thus to attack Rios' credibility.

At this point, the record shows there was colloquy between the trial court and Rodriguez' counsel concerning this cross-examination. Nevertheless, no objection was interposed by the prosecutor, and counsel was permitted to complete his cross-examination of the witness on this point.

As nearly as we can decipher the argument made here, the complaint lies because the court "nullified any good that this attack on the witness' credibility might have effected." Or, in other words, counsel's efforts were set at naught because the court commented: "I have told this jury and I tell them again that these statements only affect the individuals who gave them and cannot be used as evidence against

any other defendant that may be named in that statement or confession."

There is no claim made denying the propriety or legal correctness of the court's comment, but the prejudice is said to emanate from the fact that the remarks "nullified" counsel's endeavor. If the applicable law had such effect, we can see little justification in criticizing the judge for having invoked it. The difficulty springs from the law itself, which is not even charged with being erroneous. It has not been made clear to us how the application of an admitted rule of law constitutes prejudicial error or why it suggests a reversal.

## POINT IV.

### *Was there a variance between the crime charged in the indictment and the State's proof?*

(Rodriguez and Vega claim the State failed to establish a *prima facie* case against them and there should have been a judgment of acquittal. These points will be held and disposed of hereafter together with the issue that the same verdicts are against the weight of the evidence.)

The present indictment charges all the defendants "willfully, feloniously and of their malice aforethought did make an assault and with a gun did shoot and wound \* \* \* George Booris" and that he died from the wounds so inflicted. It then recites:

"\* \* \* and so the Grand Inquest aforesaid, do say that the said Felipe Nieves Rios, alias Utita, Jose Cruz, alias Mayaree, Joaquin Rodriguez, and Gabriel Vega, him, the said George Booris in manner and form and by means aforesaid willfully, feloniously and of their malice aforethought did kill and murder, contrary to the provisions of *N. J. S.* 2A:113–1, and against the peace of this State, the Government and dignity of the same."

Rodriguez refers to the State's proceeding on the theory of a conspiracy to commit robbery and a death ensuing therefrom and asserts it was "at complete variance" with an indictment for murder resulting from "an assault with a gun." In substance, the claim is the indictment was defective, counsel saying:

"It was not a mere allegation of a technicality that is so often characterized in a criminal proceeding and all of which our courts have said tend to bring law and the administration of justice into disrepute but rather is an expression by the defendant of his constitutional right to be tried upon a specific violation of the law when so charged in an indictment."

He concludes the variance "was such as would have entitled the defendant to an acquittal."

The primary purpose of an indictment is to inform the defendant of the nature of the offense charged against him so he may adequately prepare his defense and at the same time protect himself against another indictment for the same offense. *State v. LeFante*, 12 *N. J.* 505 (1953); *State v. Winne*, 12 *N. J.* 152, 178 (1953).

The sufficiency of the indictment is to be determined in the light of the pertinent rules of court and judicial decisions. *R. R.* 3:4-3(*a*) (formerly *Rule* 2:4-11), referring to the contents of an indictment, says:

"The indictment or accusation shall be a written statement of the essential facts constituting the offense charged. * * * An indictment * * * charging the violation of a statute * * * shall state * * * the statute * * * which the defendant is alleged therein to have violated."

*R. R.* 3:4-3(*b*) provides:

"It shall be sufficient in every indictment for murder to charge that the defendant did willfully, feloniously and of his malice aforethought, kill and murder the deceased."

In *Graves v. State*, 45 *N. J. L.* 347, 357 (*E. & A.* 1883), it was held that an indictment for murder need charge only that the defendant did willfully, feloniously and with malice aforethought kill and murder the deceased.

This rule was followed and adopted in *State v. Bunk*, 4 *N. J.* 461, 466 (1950), where *R. R.* 3:4-3(*b*) (then *Rule* 2:4-11) was termed to be "merely directory." We stated (at *pages* 466-467):

"Where several defendants are charged with murder as actual participants in a robbery during which the killing was perpetrated, an indictment charging murder in the language of the statute is sufficient, without charging the defendants as principals or as accessories, and without setting forth the robbery as part of the crime."

The indictment was in simple form in *State v. Juliano*, 103 *N. J. L.* 663 (*E. & A.* 1927). One of the reasons advanced for its being faulty was that it did not apprise the defendants that robbery was part of the crime. The court held (at *page* 667):

"As to the indictment, it set forth the crime of murder in the language of the statute and charged all of the defendants as principals. As actual participants in a robbery they were all principals and as such were tried, convicted, and sentenced. Nor was it necessary to incorporate in the indictment the fact of robbery as part of the crime charged."

The indictment in the case *sub judice* complies with the standards passed upon in the adjudications above referred to. The criticism best fitted to the document under discussion surely could not be for failure to apprise or make known to the defendants the charge they were supposed to meet. If anything, it stated too much and not too little, and, indeed, a motion to strike a portion of the indictment as surplusage was made and denied before the start of the trial.

The full record reveals beyond doubt that all the defendants were adequately cognizant of the charge made against them and all of the details and circumstances, which permitted them to fully prepare their defenses.

## Point V.

*Was error committed in the summation?*

### A.

*Summation references to the confessions.*

Alleged improper remarks by the State and by counsel for Rodriguez were objected to at the trial by the defend-

ant Rios. They were principally interpretations of various statements and confessions made by Vega tending to implicate the complaining defendant in certain respects. They may have been extended slightly from their factual basis but not to the degree where they proved to be so prejudicial as to require a reversal.

Appellate courts have been prone to disregard these aberrations where the trial court exerted corrective measures to overcome prejudicial effects, and here the court had already on eight different occasions specifically instructed the jury in reference to the very same topic and apparently vigorously and fully enough to satisfy counsel. Nevertheless, it again admonished the jury, now for the ninth time, saying:

"In the consideration of alleged statements of Rios and Vega, as I have cautioned you many times during the trial and now instruct you, the statement made by any defendant is only evidential as to what he says he himself did or said, not against any of the other defendants as to what he said such other defendant or defendants who didn't make the confession did or said. I think we must by now understand each other on this point."

 The obligations and privileges and the extent and limitations of the remarks of the State's representative in summation have been commented upon and determined with much clarity in *State v. Vaszorich*, 13 *N. J.* 99, 119 (1953), and *State v. Bogen*, 13 *N. J.* 137, 139 (1953). Conduct beyond the boundaries there established may well result in reversal. The invasion here, if any, upon the constitutional rights of the defendants was not of such a character as to require such action.

B.

*Alleged inflammatory remarks in the prosecutor's summation.*

In the prosecutor's summation he said, referring to the defendants: "They didn't even have the grace to take the stand and say, 'I am sorry I did it. Give me mercy.'"

The remarks are said to have been improper as to Rios as "they amounted to a vilification" of him. "It penetrated deeply the sensitivities of the members of the jury" and "added revulsion for" the defendant Rios. "Not only was it unwarranted but it could not be countered."

We cannot comprehend what counsel means by the last expression as admittedly no objection was made to the prosecutor's remarks nor was the court asked to do anything in reference to them. Surely this course was open to the defendant had he felt he was entitled to such correctional ministrations. Contrasted to such inaction, he now asks relief on the basis of plain error of which we may take notice, R. R. 1:5–1(a).

■ The cold atrocity of the crime called for vigorous prosecution, but assuming the comment was not justified by the record, its use seems to have been nullified by the court's specific charge in submitting the case to the jury:

"In this important sphere, that is, weighing and evaluating the testimony, you members of the jury yield neither to the argument of counsel representing the defendants or to the prosecutor nor to any reference for that matter that may be contained in the court's treatment of the testimony, if they conflict with your recollection of the testimony."

## C.

### The factual mistake in the prosecutor's summation.

Rodriguez points to error when the prosecutor in summation joined him with Vega in contradicting the testimony of the official court stenographer. The State readily admits the mistake but points to the limited way in which this defendant was referred to.

■ The error was not called to the court's or counsel's attention and not a word was said about it, although we are now asked to constitute it plain error. It was apparently an honest mistake that could easily have been corrected had such relief been requested. In any event, the court's final instruction specifically neutralized it as set forth under Point B.

POINT VI.

*Was error committed by the court in its charge
or in its refusal to make any of the requested
charges?*

Various errors are alleged in the refusal to charge as
requested and in the charge made relating to the testimony
of accomplices, reasonable doubt and alibi.

▉ The trial court is not required to charge as requested
in the precise language submitted where the subject matter
has correctly and fully been covered in the charge. *State v.
Tansimore*, 3 *N. J.* 516, 526 (1950) : *State v. Roscus*, 16
*N. J.* 415, 426 (1954) ; *State v. Tune*, 17 *N. J.* 100, 116
(1954).

▉ The portions of the charge complained of in most
instances were taken verbatim from cases which have been
approved on appeal. We have reviewed each point submitted
and see no error. The charge as a whole, taken in its full
context, was a fair and complete resume of the law as
applicable to the case on trial, with full recognition and
protection to the defendants and their respective constitu-
tional rights.

POINT VII.

*Was the verdict against the weight of the evidence?*

A.

*As to Rodriguez.*

▉ Admitting the damaging effect of Rios' testimony as
it involved Rodriguez, he nevertheless urges: "There was no
corroboration of the co-defendant's testimony and no proof in
the case as a whole of any active participation, aiding and
abetting by this defendant."

As we read it, the record reveals otherwise. Rios' testi-
mony, even with the legal caution and the careful scrutiny
the law directs, was sufficient of itself to justify Rodriguez'

conviction at the hands of the jury. But this was by no means the only evidence directed at him. He was seen at the luncheonette two weeks before the commission of the offense. He was present on the return trip from Chicago with Vega and Cruz when they talked at length about the contemplated holdup in the presence of the witness Calavira and Rodriguez signified his intention to participate. There is testimony he further discussed these plans in New York City with Vega and Cruz. He was present in the restaurant the night preceding the holdup with the other three defendants when the commission of the crime was again spoken of at length. It was then emphasized the victim "had a lot of money * * * he cash checks for customers * * * he is good for shooting."

He slept in his car "under the railroad bridge" with two other defendants the night before. Several witnesses saw his automobile on the morning in question at Second and Linden Streets about 7:30 A. M. one block from the luncheonette, and about 8 A. M., immediately prior to the robbery, his car was seen parked on Friends Avenue one-half block from the restaurant, where Cruz and Rios entered his car, which immediately drove off.

Another witness who knew Rodriguez and his car said he saw this defendant driving in his car with a passenger on two occasions between 8 and 8:15 A. M. at the intersection of Third and Pearl Streets, one block from the luncheonette. Other witnesses saw Rodriguez and Cruz in a car with a third man in the back seat "with his hat over his face" after the holdup. A witness testified Rodriguez in New York admitted he "was in trouble" in New Jersey.

There was a conflict between the stories of Rodriguez, Cruz and Rios concerning the trip from New York to Camden as to whose car they rode in and who was present, but that seems immaterial as all admitted being in Camden when the crime was committed.

In view of the record, we can conceive little worth in the suggestion that the verdict was against the weight of the evidence.

## B.

### As to Vega.

Vega, the State insists, was the originator of the criminal scheme which resulted so unfortunately for all concerned. But his counsel not only denies this but says the verdict as to him is contrary to the evidence and should be set aside.

To subscribe to such a conclusion we would have to allot complete verity to the defendant's denial and foreclose ourselves to the other testimony in the voluminous record presented. It means the elimination of the most material and important evidence emanating from the witness Calavira, who was approached on three different occasions by Vega to join in the criminal endeavor. It means the eradication of the testimony of Alonzo, William and Emma Suggs, including his use of Alonzo's car and his threat, dripping with guilt, exhorting the witnesses not to testify truthfully. It means ignoring the testimony of the witness Flores, who saw Vega with the other defendants at the scene of the crime the night before when they apparently all thought the victim was "good for shooting." It means casting out the implications of the other defendants as to what actually occurred and the testimony of others who appeared for the State.

If these concessions were all made, there would still remain Vega's confession which, we have already decided, was sufficient unto itself to create a question of fact to be decided by a jury.

The record, from our study, abundantly supports the charge made against this defendant and amply justifies the jury's verdict of guilty. Our law is well settled that a verdict will not be set aside as against the weight of the evidence unless it clearly appears that it is the result of mistake, passion, prejudice or partiality. *State v. Cox*, 128 *N. J. L.* 108 (*E. & A.* 1942); *State v. Monia*, 132 *N. J. L.* 91 (*Sup. Ct.* 1944); *State v. Lederman*, 112 *N. J. L.* 366 (*E. & A.* 1934); *State v. Dworecki*, 124 *N. J. L.* 219 (*E. & A.* 1940); *State v. MacLean*, 135 *N. J. L.* 491 (*Sup. Ct.* 1947); *State v.*

*Treficanto, supra; State v. Hauptmann*, 115 *N. J. L.* 412 (*E. & A.* 1935); *State v. Cole*, 136 *N. J. L.* 606 (*E. & A.* 1948); *State v. Cordasco*, 2 *N. J.* 189 (1949); *State v. Pierce*, 4 *N. J.* 252 (1950); *State v. Goodman*, 9 *N. J.* 569 (1952); *State v. Peterson*, 10 *N. J.* 155 (1952); *State v. Cooper, supra; State v. Bunk, supra; State v. Beard, supra; State v. Monahan*, 16 *N. J.* 83 (1954); *State v. Roscus, supra.*

Some of the matters presented have not sufficient substance requiring specific disposition, but we have examined the lengthy record thoroughly and have had little difficulty concluding that the trial as to the factual basis was full, fair and impartial, while legally the defendants' interests were fully protected.

The court's rulings were in accord with our recognized principles firmly established by our decisional law, and the constitutional privileges of the defendants were constantly recognized.

We perceive no error in the judgment below and it is accordingly affirmed as to each defendant.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.