THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. LEO ROBERT FORCELLA, DEFENDANT-APPELLANT.

Argued January 23, 1961—Decided June 5, 1961.

*Mr. George R. Sommer* argued the cause for defendant-appellant (*Mr. Vincent J. Commisa,* of counsel).

*Mr. Joseph P. Lordi,* First Assistant Prosecutor of Essex County, argued the cause for plaintiff-appellant (*Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney; *Mr. Sanford M. Jaffe,* Legal Assistant Prosecutor of Essex County, of counsel and on the brief).

The opinion of the court was delivered by

SCHETTINO, J.   Defendant, Leo Robert Forcella, was convicted of murder in the first degree without a recommendation.   He appealed as a matter of right.   *R. R.* 1:2–1(c).

On February 4, 1960, at approximately 9:15 P. M., defendant shot Marion Wetzel to death in the Hollywood Garden Tavern in Newark partly owned and operated by her.   Forcella and Marion Wetzel had become romantically involved and at one time planned marriage.   The events of February 4, which resulted in the tragic death of decedent began when defendant visited a bar in Hoboken partly owned by the deceased.   He went to Hoboken to paint the bar, but finding a lack of adequate equipment, stayed only a short time and left with a Mr. Pasquale.

They drove to Newark in Pasquale's car in order to have the windshield of the car repaired and then returned to the tavern in Hoboken where defendant drank beer. Some time later defendant left and drove to the Hollywood Bar, arriving at about 6 P. M. He stayed for thirty or forty minutes during which time he had two small bottles of beer, each containing seven or eight ounces. He then drove home to Montclair where he lived with his daughters. He had supper and returned to the tavern at 8:15 or 8:30 P. M.

When defendant returned to the bar, he ordered drinks for Marion Wetzel, for himself and for a Lucille Cross, who was a friend and employee of the deceased. Marion Wetzel was tending bar at the time. He drank a small bottle of beer, ordered another, and then demanded to know where the deceased had been. She replied that they were not married and she did not have to tell him where she had been.

She then came out from behind the bar and went to a telephone booth. After a few minutes, she asked Forcella to speak to her mother on the telephone. The mother and defendant disagree as to the exact conversation between them, but agree that she asked him why he was arguing with Marion and told him that she did not want to see him. Thereafter, the telephone rang and Lucille Cross answered it and spoke to the mother.

The telephone rang again, Lucille Cross again answered it, and left the tavern by the front door to fetch a neighbor to the telephone. When she was returning to the tavern, she saw defendant leaning over the front seat of his car and reaching in the vicinity of the glove compartment. She re-entered the tavern and sat on a stool at the bar. Thereafter she saw in the mirror on the wall behind the bar defendant pointing a shotgun at Marion Wetzel who was then facing him. She heard a shot and saw the deceased fall. Lucille Cross then ran into a rest room and did not emerge until after the police had arrived.

Other witnesses saw Forcella inside the tavern with a gun in his hands before and after the shooting. After the shooting defendant ran into a telephone booth. When he came out, two of the witnesses grabbed him and were wrestling with him for the shotgun when the police arrived.

The police took the shotgun, examined it and found an expended shell in the right chamber and a fully loaded shell in the left chamber. They searched defendant and found an unexpended shell in his coat pocket. The two policemen, who rushed over toward defendant when they came into the tavern, testified that they heard defendant say that he had shot the deceased, that after they had taken defendant to the police station, defendant told them that he had been drinking for about three days, that he was a hot-tempered man and that he shot Marion Wetzel because she would not serve him any more drinks. Defendant also testified that prior to the shooting he had been drinking heavily, but on cross-examination defendant admitted he was sober at various times during the day. Several witnesses testified that he did not seem intoxicated.

At noon the next day, at Newark Police Headquarters, defendant made a statement which was admitted into evidence without objection. In it defendant related his family history, his background and the previous days' activities. He stated that he did not remember loading the gun or shooting Marion Wetzel. He did identify the gun and the shells as his. He explained that the gun was in his possession because he had intended to deliver it to his son.

Mrs. Anna Patron, the mother of the deceased, testified that about twenty-five minutes after the first telephone conversation with defendant (the one in which the deceased spoke first and then put defendant on the telephone), defendant called her and said that he was going to kill her daughter, that she then called the tavern and spoke to Lucille Cross and that some fifteen to twenty minutes later, defendant called back and said that he had just shot her daughter and told her to call the police.

The only defense offered was that defendant had blacked out and could not remember what he had done from the time he argued with the deceased at the bar to the time he was apprehended. Defendant testified that these blackouts first occurred at Christmas time in 1948, when he shot and killed his then wife. He pleaded *non vult* to the indictment for her murder claiming that he could not remember killing her. The court accepted his plea and sentenced him to 25 to 30 years. He served 10 years and was paroled on January 6, 1959.

Defendant stated that he suffered blackouts six or seven times while he was in prison. He claimed he does not remember the blackouts but that other inmates told him about them. Defendant testified to one time when he was hospitalized in the prison for two days because of a blackout. The prison doctor, however, testified that defendant was hospitalized "for a headache," "just for observation because he complained of his head," and that he was treated only with aspirin. The doctor at the Rahway prison said that defendant did complain of migraine headaches and admitted that he never tried to determine the cause, but said that headaches were the biggest source of complaint at the prison. The prison doctors had no record of any such blackouts and stated that if blackouts did occur, they would have been put in the institutional records.

Defendant also said that in September 1959, while pursuing his normal occupation as a painter, he suffered a blackout. He was painting on the second floor and fell from a ladder to the ground.

In connection with the alleged blackout on the night of the shooting, the police testified that Forcella did not complain of any blackout until he was questioned by the detectives at about 11:20 or midnight on the same night and about two hours after the shooting.

Defendant admitted that he never sought any medical attention for his blackouts.

Dr. Arangio, the supervising psychiatric consultant for the New Jersey prison system, testifying for the defense, stated that he gave defendant his pre-parole psychiatric examination but that during the course of the examination, which lasted for 2½ hours in August 1958, defendant did not complain of blackouts. As a result of the examination he concluded that defendant had "personality difficulties" which needed psychiatric "correction," that the "personality was not well integrated," that he did not consider defendant insane but defendant had "difficulties with underlying emotional conflict that motivated him to deviate from the norm." He recommended that "the patient receive psychiatric treatment after he left prison," so that defendant might better adjust himself to outside life after a confinement of 10 years in prison.

Dr. Arangio had filed a report with the parole board. The report was offered by defendant and stipulated into evidence. In it the doctor stated that defendant said he shot his wife in 1948 because he was drunk and they had some silly argument, that defendant was evasive about some of the details of the crime and that defendant functions in the "bright average intellectual range with potentialities that go to the superior to very superior range." The report continues that the "basic orientation is that of a hedonistic individual" and there was much "jealousy" on the part of defendant in connection with his wife.

On cross-examination Dr. Arangio stated that defendant knew the difference between right and wrong and understood the nature and quality of his acts.

Dr. Kesselman, a psychiatrist called by the State, testified that on the morning of February 6, 1960, two days after the killing, he examined defendant at Newark police headquarters for 40 minutes or an hour and his diagnoses were: "Without psychosis, emotionally unstable personality. Secondly, reactive or situational depressive reaction." His conclusions were:

"He is not mentally defective and he is not psychotic or mentally ill at the present time. * * * There is not present sufficient psychopathology to diminish or mitigate full responsibility for his offense. He is able to distinguish between right and wrong and is aware of the consequences of his behavior and can also distinguish and understand [the] nature and quality of his acts."

The doctor said that one could interpret "the explosive expression of hostility on the part of the subject on the basis of suspicion and jealousy" but that these suspicions and jealousies are found in normal persons. This psychiatrist stated that defendant told him that he could not remember any of the details of the present offense and that he never had any obsessions or compulsions. He also stated that Forcella was not mentally defective or psychotic on February 4.

The prosecutor posed a hypothetical question which included a reference to drinking, the various telephone conversations, the statements of deceased as described by the witnesses, the statements of the police and the loading of the shotgun. The psychiatrist answered that in his opinion defendant had the capacity to deliberate and premeditate.

Defense counsel also posed a hypothetical question to Dr. Kesselman which included references to a great deal of drinking and omitted the events during the period of the blackout. The doctor answered:

"From the story as you delineate it, I would say that up until the moment he blacked out he had a cognizance of what he was doing, but there was mitigating responsibility based upon the amount of alcohol he had consumed."

He was then asked:

"And at the time he blacked out, would he know the consequences of his acts?"

He answered:

"Well, judging from the story you present, with the coherent conversation he had over the telephone with his girl friend's mother

and the logical sequence that developed, I would say there was diminished responsibility, but he had responsibility for what he was doing at the moment until he blacked out."

Defendant asserts that at the time of the shooting he did not have control of his mental faculties and, therefore, was incapable of committing the crime charged. He contends that the testimony establishes this and, therefore, the verdict was against the weight of the evidence.

■■ A verdict will not be set aside as against the weight of the evidence unless it is clearly the result of mistake, passion, prejudice or partiality. *State v. Haines, 20 N. J.* 438, 446 (1956); *State v. Auld, 2 N. J.* 426, 439 (1949); *State v. Cordasco, 2 N. J.* 189, 204 (1949).

The trial court clearly apprised the jury of the nature of defendant's defense. The jury was charged as follows:

"Of course, it is for you, members of the jury, to say what he means by this term 'blackout' and what was his actual mental state at the time this alleged crime was committed. If you should determine that at the time of the alleged crime this defendant was suffering from a blackout due to a mental or neurological disease or impairment that so prostrated his faculties as to render him incapable of comprehending what he was doing, then he must be acquitted of the crime in any of the degrees contained within this indictment."

The verdict as returned by the jury was entirely justified in accordance with the facts adduced. The evidence pointing to defendant's guilt factually and legally was abundant. The question was reduced to determining the credibility of the witnesses and the weight to be given their testimony. These issues are for the jury. *State v. Haines, supra; State v. Auld, supra.*

■■ We are satisfied the jury was justified in finding that defendant at the time he committed the crime knew the nature and quality of the act he was doing, that he was able to distinguish between right and wrong and that therefore the legal test of mental responsibility was met. *State*

*v. Auld, supra; Aponte v. State of New Jersey,* 30 *N. J.* 441, 450 (1959).

Defendant also contends that the trial court improperly charged the jury as to the crime of manslaughter. The charge on manslaughter was sufficient. However, there should have been no reference to manslaughter at all. Manslaughter was not an issue in this case because under defendant's theory, if his defense of lack of mental responsibility had been established, the jury would have brought in a verdict of acquittal. The reference to manslaughter did not harm defendant. Indeed, it gave him another, but undeserved, platform upon which to stand. See *State v. DiPaolo,* 34 *N. J.* 279, 299 (1961).

Finally defendant contends that the trial court erred in refusing to charge the following:

"31. If an acccused mind because of worry, drink, anger or disease was prostrated to such an extent that it made him incapable of the specific intent to kill the offense would be murder in the second degree."

The trial court specifically referred to intoxication as mitigating the offense to murder in the second degree in accord with *State v. Wolak,* 26 *N. J.* 464, 477 (1958). The trial court also directed the jury to consider, in assaying the degree of the crime, all the evidence bearing upon defendant's mental capacity, his neurological and mental infirmities and inflictions even though the jury did not believe defendant's claim of blackout. We conclude that the trial court properly charged in substance those parts of defendant's request No. 31 as might be sustainable by the evidence.

Affirm.

*For affirmance*—Chief Justice WEINTRAUB, and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.