**Petition of Leo Robert FORCELLA for a Writ of Habeas Corpus,**

**Leo Robert Forcella, Appellant.**
**No. 15120.**

United States Court of Appeals
Third Circuit.

Argued April 15, 1966.
Decided Jan. 17, 1967.

**38**

Lee A. Holley, Orange, N. J., for appellant.

Barry H. Evenchick, Asst. Prosecutor of Essex County, Newark, N. J., (Brendan T. Byrne, County Prosecutor of Essex County, Newark, N. J., on the brief), for appellee.

Before McLAUGHLIN, GANEY and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

McLAUGHLIN, Circuit Judge.

Appellant was convicted of first degree murder in the New Jersey State Court and sentenced to death. The conviction was affirmed by the New Jersey Supreme Court, 35 N.J. 168, 171 A.2d 649 (1961). Petition for rehearing was denied December 11, 1961. Appellant's petition for certiorari was denied by the United States Supreme Court, 369 U.S. 866, 82 S.Ct. 1035, 8 L.Ed.2d 86 (1962). Application was thereafter made to the United States District Court for the District of New Jersey for a writ of habeas corpus. That was denied June 26, 1962, without prejudice, for failure to exhaust state remedies. Appellant next sought such writ from the New Jersey Superior Court. As stated in the appeal from the denial of that petition by the New Jersey Supreme Court, 40 N.J. 309, 311, 191 A.2d 472 (1963), "The matter was assigned to the judge who presided at the trial and a hearing was held on September 21, 1962. The petition was denied and the cause dismissed." The New Jersey Supreme Court affirmed that judgment, supra, holding p. 311, 191 A. 2d p. 473 "The complaint seeking the writ contains eleven counts all of which are cast by the pleader in constitutional terms. We have considered the merits of the grounds advanced in the complaint and find no substance in any of them." After that a second habeas corpus peti-

tion was filed in the United States District Court for the District of New Jersey. The eleven counts of the petition were identical with those of the state court habeas corpus petition except that the paragraphs were renumbered.

With respect to the material that was before the District Judge and whether a hearing was indicated the Judge stated in his opinion:

"In considering this present application this Court has secured a transcript of the entire jury selection procedure and trial. This transcript comprises some nine volumes of testimony. In addition the Court has had the benefit of detailed appendices supplied by counsel for the petitioner in which reference is made to the transcript and to which the full transcript of motion arguments are attached. In addition counsel for petitioner has submitted a brief apparently fully stating his position in the matter. At the date set for oral argument counsel for petitioner and the prosecutor agreed to waive same and rest their contentions on the file and the voluminous record of the proceedings. The Prosecutor's office submitted a copy of their brief filed with the Supreme Court in the State habeas corpus proceeding.

"The Court has given this matter long and careful attention and has fully read and digested all of the material submitted. The nature of the case is admittedly grave. The petitioner's contentions have been given full consideration by the New Jersey Supreme Court. As heretofore stated, the same contentions are raised in this proceedings for habeas corpus relief. The arguments raised may all be determined from the record and the transcript of the proceedings. There are no new elements alleged or contentions made which would require a hearing in the matter."

Appellant clearly agrees with the above in his brief, p. 5, where he says: "Upon the question of whether or not a hearing would be held, counsel rested upon the voluminous record before Judge Coolahan." The particular docket entry of the District Court found in appellant's appendix also bears this out. The entry reads:

"5–5–64 At call for hearing on petition for a writ of habeas corpus, Counsel indicated the matter would be submitted on the trial record and briefs to be filed. (Coolahan) (5–4–64)"

Our independent study of the state court record verifies completely the decision of the District Judge that in the full trial record plus the briefs and appendices of counsel he had everything before him necessary to his decision and that a hearing was not required. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

The District Court in a comprehensive, carefully documented opinion denied the application for the writ. Actually there would be no need or really justification for stating our views at any length except for the circumstance that on oral argument some question arose about evidence having been introduced at the voir dire and in the trial itself concerning a prior homicide by defendant for which introduction the state was responsible. To satisfactorily deal with that problem the factual picture should be briefly outlined.

For about a year prior to February 1960, appellant, then fifty-nine years old, had been very friendly with Marion Wetzel who at the time was fifty-two years old. On February 4, 1960, shortly after 6:00 P.M. he entered a Newark, New Jersey tavern which Miss Wetzel owned and operated. She was there and they quarreled. A little later a witness saw appellant outside the tavern at his car, return to the tavern and point a shot gun at Miss Wetzel. The witness heard a shot and observed Miss Wetzel fall. When the police arrived they saw appellant struggling with two men for his gun. Witnesses testified that appellant at the time said, "I shot her. She's behind the bar." A shotgun shell was obtained from appellant's pocket. In a statement to the police appellant said he

had blacked out and had no knowledge of the shooting. In the brief for appellant it is admitted that "Forcella did not question, at anytime, that it was his act, by the use of a shot gun, that caused the death of Marion Wetzel."

Forcella was indicted for first degree murder. His trial started on May 2, 1960. It is asserted on his behalf that "The panel of jurors chosen for the Forcella trial were quickly and effectively indoctrinated in an atmosphere of prejudice and bias." Complaint is made that the voir dire was before the whole jury panel and the statement is made that during it " * * * the trial court allowed the propaganda to commence."

The assertion that there was substantial error by reason of the voir dire examination being conducted in the presence of the jury panel is specious. The New Jersey procedure for the selection of a jury in a capital case was meticulously followed by the trial judge. There was no mention whatsoever of holding an in camera session, no thought of it or need for it.

The unmistakable neutral atmosphere surrounding the entire selection of the jury and the meticulous fairness of the trial judge and counsel on both sides were evident immediately on the examination of the first panel member called. The prosecutor inter alia asked as follows:

"Q. Mr. Jones, you understand at this posture of the case that both defense counsel and I are going to ask you certain questions not for any personal reasons but because we are trying to get a fair and impartial jury both for the defendant and the State.

You appreciate that fact, don't you?"

The answer was "Yes".

The prosecutor explained carefully and correctly the indictment for first degree murder, the jury function including that "a person found guilty of murder in the first degree is subjected to the death penalty, unless the jury, after a consideration of all of the testimony and his Honor's instructions as to the law, recom-

mends life imprisonment, in which case no other punishment shall be given."

In examination by the defense attorney the following questions and answers occurred:

"Q. Now, we are looking for a group of men and women as jurors in this case who can approach the case with an open mind, who can approach it without any prejudice or bias, who will give the defendant the benefit of every reasonable doubt that might arise from the evidence and give the defendant a fair and impartial trial. Do you feel that you fall within that class of person? A. Yes.

Q. Do you know of any reason whatsoever why you can't sit in this case and decide it solely upon the evidence? A. No."

Mr. Jones was accepted as a juror.

The examination of the second person called was indicative of the careful insistence of the judge that the jurors have no bias or prejudice. The court's questions and the candidate's answers were:

"BY THE COURT:

Q. Do you mean that you could not decide this case strictly and wholly on the evidence and the charge of the Court? A. I am afraid not. This friend is still very critical.

Q. Because of that experience you think that will intrude upon your deliberations here?

A. Yes."

The court asked the third prospect "You are saying that in no event would you vote for the death penalty?" The answer was "Yes, Your Honor." The prosecution challenged for cause and this was allowed.

The defense led off with the questioning of the next member:

"Q. You realize that this is a case in which the defendant is charged with murder and that the prosecutor is seeking the death penalty. Do you know any reason why you could not sit in this case and try and determine it without any bias or prejudice one way

or the other and arrive at a verdict in the case? A. Yes.

THE COURT: You don't know any reason why?

THE JUROR: No, I don't have any reason."

Both sides again stressed that they wanted a jury with an open mind without any bias or prejudice one way or the other.

The above was the pattern of the voir dire interrogation of the entire 154 men and women examined. A proportionately great number of them stated an abiding objection to capital punishment and were properly excused. Others had physical conditions, the care of sick relatives and business reasons which rightly called for being released from service. To a large extent the above conditions developed immediately and were passed upon at once. Therefore in those instances the prime questions above detailed were not asked. In every other examination which reached the fundamentals of the prospect's ability to judge the evidence without bias or prejudice, etc., the absolute necessity of those people selected as jurors being absolutely fair and impartial was constantly and strongly impressed upon the individual panelists and the whole group present. Some of these had read newspaper stories of the killing involved and had thereby become prejudiced and were excused for that reason. Others had not been affected by newspaper stories. The forty-seventh person examined had read newspaper articles and had been influenced by them. He said "Well, I don't know as I couldn't sit on the jury but I don't believe I would turn a man loose to do it the third time." The prosecutor who was interrogating immediately advised the court that he believed " * * * this man has certain opinions concerning this case * * *." The defense examined the man at length and he said " * * * I would endeavor to do my best, to start all over", but he was not sure he could. The judge from the bench once more detailed the sine qua non in order to qualify for service on the jury saying:

"Q. And you are further saying, I take it, that you could not decide this case solely and wholly on the evidence that's adduced in this courtroom and on my charge, that your reading of the newspaper article would intrude itself upon your consideration?

A. Of course I haven't heard all the evidence. There could be a change of opinion that way.

Q. Are you saying that you could not decide this case wholly and solely on the evidence which is adduced in this courtroom and my charge of the law? Is that what you are saying? A. No, sir.

Q. You could not do that? A. No.

THE COURT: I will grant your motion I will excuse him for cause."

Throughout the complete, searching questioning of the 154 persons called for jury service there is not the slightest intimation that anything mentioned during the venire interrogation affected those examined later in even the slightest degree. Where such item was referred to at all, it was substantially as with the twenty-fifth person called whom the defense queried as follows:

"Q. Now, do you know anything about this case other than what you have heard about it here? A. That's all, what I heard here.

Q. Do you know of any reason why you couldn't sit on this jury and arrive at a verdict in accordance with the evidence adduced in the trial? A. No.

Q. If you were selected as a juror in this case do you think you could approach the case with an open mind? A. I could.

Q. Would you be able to presume and consider the defendant as innocent throughout the trial until you heard all of the evidence and the Judge's charge? A. I could."

The forty-eighth person examined immediately after number forty-seven above mentioned, was suffering from a nervous disability and because of it was excused. The forty-ninth member of the venire was taking care of his sister seri-

ously ill with asthma, and was excused without other questioning. The fiftieth one was excused by reason of his opposition to capital punishment. The fifty-first, fifty-second, fifty-third and fifty-fourth were let go for reasons of business, health, opposition to capital punishment and again, health.

The fifty-fifth person called, a lady, very well illustrates the total lack of impact upon the venire of previous questioning of and comment by members of the panel as they were examined one by one. She was asked, "Well, have you formed any definite opinion with regard to this case?" She answered *"I don't know anything about this case."* (Emphasis supplied).

The only other instance of any reference whatsoever to the prior crime was by the 151st talesman called. He after 3½ pages of examination by counsel, was asked by the trial judge "Well, are you saying that from a reading of the newspaper accounts of this case you have come to a conclusion as to the guilt or innocence of this defendant? Is that right? A. Well, yes. The fact that this man had done this before * * *." That was everything said by the talesman on the point. The judge continued to examine him, finally asking, "Well, will you decide this case solely on the evidence which is heard here in this courtroom?" The answer was *"Yes, sir."* (Emphasis supplied). Counsel queried "Can you approach this case with an open mind?" The court said "Well can you? It's a very simple question." The answer was "Well, yes, sure, surely." Counsel, stating that the presumption of innocence of a defendant in any criminal case " * * * cannot be removed from him unless and until, after a consideration of all the evidence, you find the defendant guilty beyond a reasonable doubt", then asked the juror, "Can you approach this case and sit through the trial of it understanding that and bearing that foremost in your mind?" Answer "I can". Asked that "If after a consideration of the evidence in this case you have a reasonable doubt as to the guilt of this defendant,

would you acquit him", the talesman replied "If I had a reasonable doubt, well, I guess so, yes, sir. Q. *Are you sure?* A. *Yes sir."* (Emphasis supplied).

The voir dire examinations of every one of the venire down to and including the last person questioned (who was the 154th panel member passed upon) have been conscientiously studied. With no reservation, that thorough check out of all the 154 separate examinations reveals that the remarks of Nos. 47 and 151 are the sole such comment in the record. If they were heard by anyone other than counsel and the court, it is fair to conclude that no attention was paid them. Actually there was no reference to either remark thereafter directly or indirectly. Indeed it is obvious from the entire voir dire record that the venire generally attached no importance to what was said in the course of the interrogations. There are several specific instances of that, two of these illustrate the overall feeling. The seventieth person examined and who was chosen as a juror was asked by the defense and answered as follows:

"Q. Do you feel that if you were selected as a juror you could approach this case with an open mind? A. Yes, sir.

Q. Have you read anything about this case? A. No, sir, I have not.

Q. Has anyone talked to you about it? A. No, sir, only what I heard here since yesterday. That's all.

Q. Other than what you heard in the courtroom is the only thing you have heard? A. Yes, that's right.

Q. So that you have no feelings or no thoughts one way or the other. A. No, sir.

Q. And if you are selected as a juror in this case would you be willing to give the defendant every reasonable doubt that arose from the evidence or lack of evidence in this case? A. Yes, I would, sir, yes, sir.

Q. And are you willing to start out the case with an open mind presuming the defendant to be innocent of the charge? A. Yes, sir."

The 116th venireman was questioned by the defense attorney and answered:

"Q. Mr. Jinks, in what section of Belleville is William Street? A. The valley; below the avenue.

Q. Yes, I know where you mean. If you were selected as a juror in this case, would you approach the case with an open mind, presuming the defendant to be innocent of the charge? A. I would, sir.

Q. Have you read anything about this case? A. No, sir.

Q. Have you heard anything about the case other than what you have heard here in the courtroom? A. No, just in the jury room, just odds and ends.

Q. And from what—— A. Of no importance.

Q. What? A. No importance.

Q. And from what you have heard, have you any preconceived idea as to the innocence or guilt of the defendant? A. No, sir."

■ There was no motion to discharge the venire because of the remarks by Nos. 47 and 151 or anything further regarding them. We are firmly convinced that this was in the exercise of sound judgment by the competent, widely experienced defense lawyers. As is seen the prosecution had nothing to do with the incidents other than to end the first one at once by its matter of fact motion. The second instance affirmatively establishes that talesman No. 151, once he understood his duty as juror, completely accepted his responsibility to act in accordance therewith. We are also satisfied from the whole record that there was no harm to defendant, certainly no substantial harm, by reason of the remarks.

The entire selection of the jury was in strict accord with the landmark New Jersey voir dire opinion in State v. Rios, 17 N.J. 572, 112 A.2d 247 (1955). See also In the Matter of the Petition of Forcella for a Writ of Habeas Corpus, 40 N.J. 309 (1963), concurring opinion, Schettino, J., 311, et seq., 191 A.2d 472, 473.

This brings us to the oral argument contention that defendant's prior crime was injected directly into this trial by the prosecution. The statement is made on behalf of appellant that " * * * the Prosecutor erroneously states (a) that the defense disclosed the first 1948 killing to the jury;". The transcript shows that this is exactly what defendant himself did and even a cursory reading of it reveals it not as appellant's brief would have it " * * * a wild attempt at mitigation * * * but an elaborate, skillfully stated life story by the defendant covering down to and including the slaying before us. This took 32 transcript pages to unfold in direct examination. In that testimony defendant gave a detailed account of what he asserted he knew regarding the 1948 crime to which as he stated he "pleaded non vult to second degree murder." He explained at length that as to the 1948 crime he had no recollection of hitting his wife over the head with a cue stick and after that, shooting her.

■ In telling about the instant killing with his shotgun, defendant claimed that from just before the shooting he again knew nothing of what happened until after he was taken and put into a patrol wagon by the police. The cross-examination was directed against the credibility of that story. This was not only properly motivated but the prosecutor would have been affirmatively neglecting his duty had he failed to so act. If defendant's narrative had been believed by the jury it would have at least saved him from a first degree murder conviction. His own evidence plainly indicates that it was a shrewdly planned, carefully contrived effort to achieve that result. His basic strategy was to plausibly account for the damning fact that he in a similar crime of violence twelve years before had shot and killed his wife. He claimed as stated that he had blacked out at that time and had no knowledge of what he had done. He virtually repeated that same kind of tale about his wanton slaying of Miss Wetzel, i. e. that

he had again blacked out and did not remember anything.

Far from the state having any connection with the introduction of appellant's murder of his wife back in 1948, it was appellant on direct examination who, after giving that whole awful account, went into elaborate detail about pleading non vult to second degree murder, being sentenced "to twenty-five to thirty, and served ten years and thirteen days." After that he told about his hearing before the Parole Board in 1958, how he was paroled January 6, 1959, how he had met Miss Wetzel while he was in prison and she was visiting another inmate, how he contacted Miss Wetzel after he returned home and that they became engaged and on and on for 19 more pages of direct examination which wound up with him on February 4, 1960 drinking and quarreling with Miss Wetzel. His lawyer at that point asked Forcella "Then what happened?" Forcella replied, "I don't know." All that had happened was that Forcella with his shotgun had shot Miss Wetzel to death.

Appellant urges that our decisions in United States ex rel. Scoleri v. Banmiller, 310 F.2d 720 (3 Cir. 1962) and United States ex rel. Rucker v. Myers, 311 F.2d 311 (3 Cir. 1962) are pertinent to this issue. The problem in those decisions has no bearing upon the precise factual situation before us.

Out of all the remaining assertions of appellant there is one more contention now stressed which of necessity must be presented in some detail. It is said in appellant's brief that "Forcella was denied due process of law by the suppression of evidence on his behalf both by the State of New Jersey and with the knowledge of the State's representatives." At this stage what is left of the above charge concerns the appearance of Chairman Ashby of the State Parole Board as a witness subpoenaed by the defense. The State of New Jersey, appearing by an Assistant Attorney General, was opposed to the Chairman being a witness. There was a conference between the court and all the attorneys. An affidavit by one of the trial defense lawyers, submitted by appellant, states what then occurred, "A discussion as to what Mr. Ashby would testify to and as to what records were privileged ensued. As a result a stipulation was entered into in open court regarding the New Jersey Parole Board records." In compliance with the above the report of the Parole Board's supervising psychiatric consultant on his pre-parole hearing examination of Forcella was turned over to the defense. That examination had been made in August, 1958 and the written report of same given the Board later. Forcella was released on parole January 6, 1959, after having served ten years in prison. The report was introduced into evidence as a defense exhibit and read to the jury by the senior defense lawyer. The expressed interest then and at this time by the defense in the Parole Board evidence was and is in the alleged blackouts of Forcella while confined.

The report characterizes Forcella " * * * functioning in the bright average intellectual range with potentials that go to the superior to very superior range." It should be mentioned in this connection that Forcella testified that he had studied law and had served as law clerk with Newark lawyers for seventeen years. His testimony covers 100 pages of the transcript. The type of witness he made could be gleaned from almost any portion of his evidence. A fair example is the following on his direct examination in chief:

"Q. Did you ever use the term in talking to Marion or did you ever refer to her as 'you bitch'? A. That's right, I did.

Q. And what did you mean by that? A. My interpretation of bitch is supine, clever, in business acumen, wise, worldly-wise, intelligent. She was wise and she was intelligent, shrewd."

The above mentioned psychiatrist was a defense witness. He categorically stated that Forcella in the one and a half to two hour examination did not complain to him of any blackouts during the time he was confined to State's Prison. As a

fitting finale to the blackout evidence there is Forcella's own fantastic story on the question of prison blackouts. On direct examination he testified:

"Q. Now you were in prison from Christmas, 1948, until January 6, 1959, were you not? A. Yes.

Q. During that period of time did you ever have any spells where you lost all recollection of what had happened? A. A half a dozen times, sir.

Q. And will you tell us when these occurred and what occurred? A. Well, five or six times they occurred in the cell, and when I would wake up it would be as if I was just coming out of a state of suspended animation. Three or four times they tell me I was walking around there with mouth open, eyes in the air."

On cross-examination appears the following:

"Q. As I understand it, you testified while you were in State's Prison you blacked out about six or seven times? A. That's right, sir.

Q. Is that correct, sir, when I say six or seven times? A. That's right, sir.

Q. Or was it more than that? A. Well, I can only remember that.

Q. Do you always remember when you black out? A. No.

Q. But you remember six or seven times? A. That is correct. Because I used to walk around in a trance.

Q. Who told you you walked around in a trance? A. The inmates.

Q. *How about the guards?* A. *Well, they didn't know it.*

Q. Do you recall when is the first you blacked out? Was it in State's Prison or Rahway? A. At Rahway, sir.

Q. And when was it, sir? A. The second year I was there.

Q. How did you find out that you had blacked out? A. Some inmate that was there, that lived in Camden, saw me walking around in a trance, he said, and he was leading me around.

Q. *Did you report it to the guard?* A. *No, sir.*

Q. *Did you report it to the institutional doctor?* A. *Well they don't do that, the inmates.*" (Emphasis supplied).

\*    \*    \*    \*    \*    \*

Q. You say you recall six or seven times that you blacked out. On each of those occasions did you ever report it to the doctor? A. *No, sir, I just— I just report severe migraine headaches to the doctors.*

Q. Did you ever report to the doctors that you suffered a blackout while you were in these institutions? A. Sometimes I did.

Q. What? A. I believe I did.

Q. When did you report it? A. I don't know, sir.

Q. Well, see if you can approximate the time. The first blackout you had, when did you report that, sir? A. I wouldn't know.

Q. Did you report the first blackout? A. I certainly did.

Q. *You did report the blackout?* A. *I didn't report the blackout, I report severe migraine headaches, that I was blacking out.*

Q. *Did you tell them you were blacking out?* A. *No, sir.*

Q. *You did not?* A. *No, sir.*" (Emphasis supplied).

After that the witness switched his story. Asked, "And when you reported the so-called migraine headaches, did you report to any doctor or anyone in authority that you had blacked out? A. That's right, half a dozen times." A little further into his testimony he said he suffered his first blackout in State's Prison after being there two and one half months; that three people were in the cell with him; that he doesn't know their names. After that he said "I was taken out of the cell and brought to a hospital \*  \*  \*  by the officer—the guard that was on duty." He doesn't know the name of the guard. Asked "And were you taken to the institution hospital?" He

46

answered *"I walked to the institution hospital."* (Emphasis supplied). Even in this detail there seems to be some defense confusion as to what the witness did really claim in his various contradictory statements. Asked regarding his Rahway imprisonment, *"Now, do you recall telling any doctors at Rahway that you had blacked out?"* His answer was *"No".* (Emphasis supplied). Right after that, he changed his answer and said, "Yes I told the doctor that visit that morning." He did not know the doctor's name.

Forcella was recalled to the stand, as the last witness in the trial. The short direct and cross-examination starkly reveals the net product of his endeavors to support the theory of prison blackouts.

"Direct examination by Mr. Sommer:

Q. *Mr. Forcella, it has been testified here that on a number of occasions you were treated, while you were in prison, for migraine headaches.* Will you tell us what brought on those headaches? A. *When I used to blank out.* When I woke up, when I came to, I had pounding headaches from the top of the head all the ways down to the bottom of the neck for about thirteen hours.

Q. And did you tell the doctors of that condition? A. *I told the doctor about the pounding, about the severe headaches.*

Q. *And did they ask any other questions about it? A. No other questions.*

Mr. Sommer: That is all. You may cross-examine.

Cross-examination by Mr. Lordi:

Q. You say you told the doctors about the severe pounding at the back of your head? A. That's right, sir.

Q. And you say the severe headaches were brought on by these blackouts? A. Yes, sir.

Q. Did you tell them about the severe pounding? A. That's right.

Q. *Did you tell them about the blackouts?* A. *I did not; he did not ask.* (Emphasis supplied).

Mr. Lordi: No further questions.

Mr. Sommer: The defense rests."

In the light of the above evidence, the citations advanced favoring the present argument for appellant on this issue have no bearing here. We have before us what was in fact a simple, fundamental incident of trial practice. Senior counsel for the defendant was one of the top criminal lawyers of the State. He was and is of the highest standing at the bar and was assigned to this defense by the New Jersey Superior Court. His junior associate was and is one of the finest type lawyers in that trial area. Those attorneys, as their considered opinion under all the peculiar circumstances decided it was unwise from the defendant's standpoint to become involved in a controversy with the head of the State Parole Board over the question of whether the Board's proceedings were privileged. Sound thinking was bound to conclude that no good could come from the records, if any. Certainly on the defendant's clear admissions there was nothing in them about blackouts. Assuming the improbable, if there was some note regarding migraine headaches, the one thing the defendant was consistent about was that his stated headaches came *after* the so-called blackouts. There was no medical evidence of connection between the two.

■■ For the purposes of this appeal the defense trial strategy is criticized. From the clear facts before us it was a justified decision by trial counsel. There was no suppression of evidence by the State of New Jersey. Nor was there any star chamber proceeding. It was a proper trial conference between the court and all the attorneys. It was within the authority of the defense counsel. State v. McMillan, 65 N.J.Super. 478, 483, 168 A. 2d 81 (App.Div.1961); State v. Bentley, 46 N.J.Super. 193, 201–202, 134 A.2d 445 (App.Div.1957). It was the same sort of proper trial conference that goes on daily in every trial court. The result of that conference was placed on the record in open court in the presence of the defendant. There was nothing technical about

it. In lieu of the Parole Board Chairman being called as a witness the psychiatric report was given the defense. If Forcella had not agreed to that, he could have, and with his background and personality, it is not too much to presume, would have so told his attorneys. The district judge brings this frivolous claim of "suppressed evidence" sharply into focus and soundly disposes of it in his opinion as follows:

"It appears from the transcript that certain stipulations were entered into between respective counsel. The stipulations obviated the appearance of a Superior Court Judge and the Chairman of the State Parole Board, both of whom had been subpoenaed by the defense. It was stipulated, and it appears in the record, that if the Judge had been called he would have testified that on an occasion Forcella visited him in his Chambers to inquire of him whether he would perform a marriage ceremony between defendant and the decedent. This merely corroborated testimony given by the defendant.

"The other stipulation was that if the Chairman of the Parole Board had been called he would have testified that a psychiatric report, which was admitted into evidence and read to the jury, was submitted to the Board in August, 1958 and after a hearing in September, a parole was granted effective January 6, 1959. There was no contention made that the stipulations were not in accord with the facts which were submitted to the jury.

"These stipulations, which were worked out between counsel and the Court, did in no wise impair the fairness of the petitioner's trial. 'In New Jersey as in other states, it is settled that an attorney in a criminal case has implied authority to make stipulations and agreements incidental to the management of the defense in matters of trial procedure and the defendant is bound thereby.' State v. Ciniglio, 57 N.J.Super. 399, 406 [154 A.2d 845] (App.Div.1959), cert. denied 31 N.J. 295 [157 A.2d 364] (1960). However,

although Forcella was not present when the stipulations were made he was present when his attorney placed them on the record in open Court. Under such circumstances, we can assume that he consented to his attorney's procedure.

\* \* \* \* \* \*

"The petitioner's brief attempts by way of innuendo and aspersion to challenge the propriety of the matters discussed in Chambers. It is not unusual in a trial of extended duration for the Court to confer with counsel in Chambers in regard to various problems and procedural matters which may arise. The defendant is safeguarded in these proceedings by the presence of his counsel. Matters such as jury instructions are in the legal province of the Court and the petitioner's brief itself labels this 'not significant in itself'."

We have closely examined all other points urged on behalf of the appellant. They are without merit.

The judgment of the District Court will be affirmed.

FREEDMAN, Circuit Judge (dissenting).

I respectfully dissent. The majority opinion has powerfully depicted the fairness of the trial judge in the conduct of the proceedings by referring to the numerous instances in which jurors were excused for cause and others were given the opportunity to say whether they were open-minded. It has concluded from this that the jury before whom the appellant was tried for his life had not been infected by any prejudice and that in any event the jury's knowledge that he had committed an earlier murder did him no harm because it was connected with his defense that he had blacked out, as he had also claimed on the first murder.

The undisputed principle which is our starting place is that evidence of appellant's murder of his wife under similar circumstances twelve years before would not have been admissible here, since such evidence, although relevant, is inherently

and unduly prejudicial. Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); see United States ex rel. Scoleri v. Banmiller, 310 F.2d 720 (3 Cir. 1962), cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963); United States ex rel. Lowry v. Myers, 364 F.2d 297 (3 Cir. 1966). Yet here it was the appellant's counsel in his opening statement, and the appellant himself on direct and cross-examination, who brought in the circumstances of the prior murder. The majority attributes this to trial strategy on behalf of the appellant. It seems to me at least equally attributable to the fact that the prior murder had already been revealed in the course of the *voir dire* examination and to the Hobson's choice that faced the trial strategist of either ignoring the devastating fact of the prior murder or encountering it head on and emphasizing the circumstances of black-out which the appellant had claimed surrounded it.

There are two instances in which the fact of the prior murder was mentioned in the presence of the venire. After four jurors had been impaneled a venireman whom the prosecutor asked whether he could sit on the jury, replied: "Well, I don't know as I couldn't sit on the jury but I don't believe I would turn a man loose to do it the third time." This was not the only such remark. After thirteen jurors had been impaneled[1] another venireman in acknowledging that he had read newspaper accounts of the crime referred also to the prior murder. When asked by defense counsel whether the newspaper accounts led him to a conclusion as to the appellant's guilt his reply was: "Well, yes. The fact that the man had done this before——."

What the majority opinion calls "the damning fact" that appellant had shot and killed his wife twelve years earlier was therefore twice mentioned by prospective jurors in the presence of the panel and of those jurors who had already been selected to serve. I therefore believe that it cannot be said that defense counsel's trial tactics were not traceable to a fear of how the jury might be affected by knowledge of the prior murder if the appellant had not attempted to explain it. Whatever may be said the other way, sufficient doubt hovers over the question which in a death case, we must resolve in favor of the accused. As Mr. Justice Reed stated in Andres v. United States, 333 U.S. 740, 752, 68 S.Ct. 880, 886, 92 L.Ed. 1055 (1948): "In death cases doubts such as those presented here should be resolved in favor of the accused."

It is true that no objection was made at the time by appellant's counsel, but it is equally true that the court made no effort to remove the harmful effect of this information from the minds of the jurors. The New Jersey courts, as the majority points out, permit *voir dire* questioning to be conducted in the presence of the entire panel. State v. Rios, 17 N.J. 572, 112 A.2d 247, 254–256 (1955). But they also have been quick to recognize the possibility of prejudice to a defendant in this procedure and therefore have held that the trial judge should respond to the disclosure of improper facts either by admonishing the jury to disregard them or by declaring a mistrial. State v. Hunt, 25 N.J. 514, 138 A.2d 1, 12 (1958); State v. Ernst, 32 N.J. 567, 161 A.2d 511, 515 (1960), cert. denied, 364 U.S. 943, 81 S.Ct. 464, 5 L.Ed.2d 374 (1961). Neither course was followed here, although the wrong was twice committed.

Nor do I believe the record justifies the assertion that appellant's claim of blackouts inevitably would have driven him to the recitation of the circumstances of the murder of his wife twelve years earlier. There is enough in the record, including his counsel's opening statement and appellant's own testimony, to indicate that he could have attempted to show blackouts while imprisoned for the first offense. Indeed, it is difficult to perceive the shrewdness and cunning attributed to the appellant in paralleling his defense here to that in the prior case

---

1. Additional jurors were to serve as alternates.

in which he pleaded non vult and was sentenced to imprisonment for second degree murder, when he could have made the claim of blackouts in prison without going into the circumstances of the prior crime.

I would hold, therefore, that appellant was denied due process of law because the jury that tried him was one in whose presence two veniremen had referred to the prior murder without even an admonition from the judge that these statements should be disregarded. I am unable to accept the notion of a courtroom so sterilized that none of the jurors who had already been selected and the large number of veniremen in attendance was infected in the slightest degree by the express statements that the appellant in a widely publicized murder charge had also committed an earlier murder. I am therefore unable to agree that the defense in laying before the jury the detailed circumstances of the prior murder was simply pursuing the tactical maneuver of claiming that he had suffered earlier blackouts.

This leads me to another claim of the appellant's able counsel. Appellant had subpoenaed the Chairman of the New Jersey Parole Board to produce certain Parole Board records. On the Chairman's arrival, accompanied by an Assistant Attorney General who opposed his giving testimony, counsel for both sides were called into the judge's chambers, where neither the appellant nor the court reporter was present. An affidavit of appellant's trial counsel alleges that after the state opposed admission of the Chairman's testimony and of the records the parties agreed on the admission of one document, the psychiatric report of the prison's consulting psychiatrist, who testified at the trial. Appellant claims that the suppressed reports would have aided his defense of blackout by demonstrating the truth of his assertion that he had blacked out in the early weeks of his original imprisonment and had been carried to the prison hospital by guards.

In the leading case of Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934) it was held that due process does not require that a defendant be present when the jury and trial counsel are taken to the scene of the alleged crime for a view. Mr. Justice Cardozo there stated that a defendant's presence is constitutionally required only when he can contribute something to his defense by being present. The proper application of this test is demonstrated by two recent cases in the Fourth Circuit. In Near v. Cunningham, 313 F.2d 929 (4 Cir. 1963), the exclusion of the defendant in a state trial from the judge's chambers, where an agreement was made among the trial judge and counsel not to sequester the jury during recesses of the court, was held to violate the defendant's constitutional right to due process where the decision resulted in exposing the jury to prejudicial remarks. On the other hand, in Root v. Cunningham, 344 F.2d 1, 4–5 (4 Cir. 1965), cert. denied, 382 U.S. 866, 86 S.Ct. 135, 15 L.Ed.2d 104 (1965), it was held that the defendant had no constitutional right to be present during the consideration of instructions by the trial judge and counsel in chambers where there was no evidence of resulting prejudice. Reconciling the two cases, the court said that the defendant's presence would have been important in *Near,* but useless in *Root:* "Near \* \* \* had a better opportunity to know the attitudes of these people [in and outside the courtroom] than his attorney or the court \* \* \*. Under such circumstances, had he been permitted to attend the conference, he could have informed the court of this hostility and, perhaps, thus prevented the making of the decision which exposed the jury to it to his disadvantage." In *Root,* however, only legal points beyond Root's competence were discussed outside his presence. 344 F.2d at 4–5.

In my view the present case is stronger than the situation in the *Near* case. Appellant was prejudiced by his absence from the conference which deprived him of possible evidence of prior blackouts while in prison, a subject of supreme importance to his defense. It was not a le-

gal technicality beyond appellant's grasp, for the contribution he could have made at the hearing in chambers on the parole records would have come from his personal knowledge of the facts, not his opinion on the law. It is a striking illustration of the familiar circumstance that counsel inevitably requires the presence of the client to bring to his attention those facts which are peculiarly within the client's own knowledge.

Because of the grave prejudice to the appellant resulting from the disclosure at the *voir dire* of a prior murder and because of his exclusion from the proceeding in chambers involving the Parole Board records, I cannot entertain that assurance that the defendant received a fair trial which alone would justify sending him to his death.

I therefore repectfully dissent.