113 N.J. Super. 322 (1971)
273 A.2d 769
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JUAN R. TAPIA AND CARMELO V LABOY, DEFENDANTS-APPELLANTS, AND JOSE MANUEL RODRIGUEZ, JORGE HERNANDEZ AND FELIX A. RIVERA, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1971.
Decided February 8, 1971.
*324 Before Judges KILKENNY, HALPERN and LANE.
Mr. Edward Weisslitz, Assistant Deputy Public Defender, argued the cause for appellants (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Solomon Forman, Assistant Prosecutor, argued the cause for respondent (Mr. Robert N. McAllister, Jr., Atlantic County Prosecutor, attorney; Mr. Ernest M. Curtis, Assistant Prosecutor, on the brief).
*325 The opinion of the court was delivered by KILKENNY, P.J.A.D.
The Atlantic County grand jury jointly indicted five men for the murder of one Albert Flacco on November 30, 1968 in Atlantic City, contrary to the provisions of N.J.S.A. 2A:113-1 and 2A:113-2. Because of the complexity of the names of those indicted, we shall for the sake of simplicity refer to them hereinafter as Tapia, Laboy, Hernandez, Rodriguez and Rivera.
The five men were jointly tried before a jury. None of them testified or called any witnesses in their defense. The trial judge granted Rivera's motion at the close of the State's case for a judgment of acquittal. The jury acquitted Rodriguez. The jury found Hernandez guilty of manslaughter. It returned a verdict of guilty of murder in the second degree against Tapia and Laboy.
They were sentenced to the Yardville Reformatory, Youth Reception and Correction Center, for maximum terms of eight years in each instance. The present appeal from the judgments of conviction is being prosecuted jointly only by Tapia and Laboy.
It is undisputed that on November 30, 1968, at approximately 12:30 A.M., Albert Flacco was stabbed to death during a barroom fight at the Adelphia Bar in Atlantic City. The jury could reasonably find from the evidence that, in that fight, Tapia and Laboy and Hernandez, at least, were arrayed on the one side and Flacco was alone on the other side. An eye-witness testified that both Tapia and Laboy used a knife in stabbing at Flacco, and Flacco, a carpenter by trade, brandished a carpenter's handsaw in warding off his attackers.
During the melee, another eye-witness, Harry R. Wilson, observed a butcher's knife, bloody to the hilt, sliding across the floor from the area across the room where the fight was in full progress and coming to rest at his foot, as he stood at the bar close to Rodriguez. Wilson thereupon picked up this knife and threw it behind the bar to prevent any further use of it. There was no direct evidence as to whose hand had held *326 this large knife or who, if any of those involved, had plunged it into the victim.
There was medical testimony by Dr. Milton Ackerman, who conducted a postmortem examination of Flacco on November 30, 1968, at about 10:15 A.M., that the victim died of a stab wound of the chest with hemorrhage produced by that stab wound. He elaborated that "the wound penetrated the left chest * * * at about the level of the sixth rib * * * passing through the lower lobe of the left lung, and then penetrating the heart." He described the wound as a "tapering wound" and calculated the depth of the wound as "five to six inches" from the skin surface to the point of the deepest penetration of the left heart chamber.
Shown a 3 1/4-inch-blade knife found in Tapia's dresser, Dr. Ackerman stated his opinion that "this knife could not have caused this wound." Shown a skewer found under a refrigerator in Rodriguez' apartment, which was circular and only three or four inches long, the doctor stated as his opinion that this skewer could not have caused the death wound. This opinion was based also on the fact that the wound was made by a "flat-bladed object" and the wound penetrating the skin "was a little bit under two inches." The smaller knife, found in Tapia's dresser, was not even an inch and one-half wide. But Dr. Ackerman stated as his opinion that the butcher knift could have produced the "entrance wound" and its blade of "almost ten inches" could have been the knife used to inflict the mortal wound.
Certainly, the jury could reasonably find the butcher knife, with blood on it to the hilt, sliding across the floor from the direction of the battle area, was the weapon used to kill Flacco.
Marion Kamen, a witness for the State, testified that, in her capacity as a senior chemist employed by the New Jersey State Police, she typed and classified blood samples of the victim Albert Flacco and defendant Laboy, as well as blood on the hilt or handle of the butcher knife. All revealed Type O blood. The skewer was negative for blood; the small *327 knife was positive for human blood, but there was not enough for typing. Hernandez' blood was Type B.
There was evidence of animosity on Laboy's part against Flacco which predated the fatal incident. Mrs. Nola Link, a girlfriend of Flacco, testified to a conversation she had with Laboy a week before November 30, during which he told her: "If I don't get your husband, meaning Al, that he will kill my child or me." This threat was apparently prompted by Laboy's expectation that Flacco would testify against him in an unrelated robbery case. There was testimony by eyewitnesses that, immediately before the murder, Flacco had walked from the bar toward a pool table where Laboy was with Tapia and Hernandez, and as Flacco approached the men, there was a heated argument in Spanish and Flacco was struck in the face by Hernandez or Laboy, or both. A fight immediately ensued, during which Flacco was mortally wounded, and thereupon Tapia, Laboy and others hurriedly left the barroom.
We need not dwell on further details at this point. We now consider the arguments advanced by Tapia and Laboy for a reversal. We shall deviate from their order of presentation for a more logical approach.

I
It is argued that it was unduly prejudicial to try Tapia and Laboy jointly with Rodriguez and that Rodriguez should have been severed from this trial.
This issue was not raised in the trial court. No motion for a severance was made prior to the trial or even at the trial. These defendants concede, "The usual procedure for the defendant who fears prejudice will result from a joint trial is to move prior to trial for a severance, and the court may grant such a motion." State v. Sinclair, 49 N.J. 525 (1967); State v. Baker, 49 N.J. 103 (1967); State v. Manney, 26 N.J. 362 (1958). R. 3:15-2(b) provides:
*328 If for any other reason it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in the indictment or accusation the court may order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief.
The joinder of the five in the same indictment for a single murder at the same time and place, on the theory that all those indicted had participated in the offense, was proper. It is authorized by R. 3:7-7. In the interests of economy and efficiency, jointly indicted defendants may be tried in a single trial. Such was the situation here. There was but a single episode.
Defendants argue that they did not move for a severance because they anticipated that a statement made by Rodriguez to Yves Bonner Ganther (hereinafter "Ganther"), an investigator for an attorney representing Hernandez, obtained by mistake, would have been admitted. However, this statement was deemed inadmissible at trial essentialy because of the attorney-client privilege. Defendants even then did not move for a severance. But they maintain that the trial judge should have, sua sponte, severed Rodriguez as a party to this joint trial.
We appreciate that there are times when the circumstances are such that a trial judge should order a severance, sua sponte, in the interests of a fair trial and justice. See State v. Carroll, 51 N.J. 102 (1968); State v. Young, 46 N.J. 152 (1965); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). But the instant case is not in that category.
Defendants allege that they had intended to use the statement, made by Rodriguez to Ganther under the mistaken belief that he was acting for Rodriguez' own attorney and Ganther's mistaken belief that he was interviewing Hernandez, as exculpatory evidence in their behalf. However, this evidence was ruled inadmissible, essentially under the attorney-client privilege, Rodriguez being a party defendant, as noted above. We find no substantial merit in this point.
*329 Nor would Rodriguez' statement constitute an "admission", as defendants assert, because an "admission," as such, can be made only by a party to an action, and Rodriguez would not, if severed from the trial, have been a "party" to the litigation.
Moreover, in the light of all the evidence, there would have been little, if any, probative value in Rodriguez' statement, so far as these defendants are concerned, as noted in Point II, infra.

II
We next consider the claim of defendants' Tapia and Laboy that it was prejudicial error for the trial court to exclude the testimony of the investigator concerning his interview with Rodriguez.
Defendants argue first that Ganther's testimony would not have been within the attorney-client privilege. We disagree. This investigator was engaged by the Public Defender to assist Mr. Donald Phillips, an attorney designated by the Public Defender to represent defendant Hernandez in this murder case. In making his investigation he interviewed Rodriguez under the mistaken belief that he was interviewing Hernandez. This was undoubtedly due to confusion stemming from some similarity of names, Rodriguez' full name being "Jose Rodriguez Hernandez," and the other defendant's name being "Jorge Hernandez." He did not interview Hernandez, the person he was assigned to interview. The interview of Rodriguez at the jail was through an interpreter  Rodriguez spoke only Spanish and Ganther spoke only English. According to Ganther's report, not admitted into evidence, Rodriguez stated that he observed the fighting take place and all of a sudden he was struck with a handsaw by Flacco, but only by the flat portion of the saw which caused no injury. Fearing he would be struck again, he allegedly stated that he quickly pulled "his knife [a 6" blade knife] and struck the victim somewhere near the left portion, the mid body." He did "not know if he hit him. He did not *330 see any blood and the victim did not fall down, and made no sign of being wounded."
The trial judge properly determined that Rodriguez gave his statement for the benefit of his own attorney, believing that his interviewer was acting as agent for his own attorney. From this, it was correctly concluded that the statement was privileged as a confidential communication under the relationship of attorney and client.
Concededly, the attorney-client privilege extends to any person who is or may be the agent of either the attorney or client. State v. Kociolek, 23 N.J. 400 (1957); State v. Lo Ponio, 85 N.J.L. 357 (E. & A. 1913). Defendants, however, argue that Ganther was not the agent of either Rodriguez or his attorney, but rather the agent of Hernandez' attorney. This is true, in fact, but his interview with Rodriguez was based upon his representation and mistaken belief that he was acting as agent for Rodriguez' attorney; and Rodriguez' statement, confidential in nature, was given in reliance upon Ganther's representation that he was acting for Rodriguez' attorney. This is not a case of a bystander accidentally overhearing a conversation between an attorney and client. See People v. Barker, 60 Mich. 277, 27 N.W. 539 (Sup. Ct. 1886), where a private detective, and State v. Russell, 83 Wisc. 330, 53 N.W. 441 (Sup. Ct. 1893), where a district attorney represented themselves to the accused as his attorney and the statements obtained were held inadmissible. We find no valid distinction between a deliberately false representation of attorney status and one mistakenly made, upon the basis of which in either instance the purported client fully relies, simply because the one misrepresentation is more grievous than the other. The confidence exists even where there was no deliberate intent to deceive. See 3 Wharton's Criminal Evidence (12 ed.), § 808 at 155.
So, too, we find lacking in merit defendants' claim that Rodriguez' statement was admissible as a "declaration against interest." See Evidence rule 63(10). They argue that a declaration against penal interest is admissible "if it *331 exculpates a defendant on trial," citing Report of the New Jersey Supreme Court Committee on Evidence (1963), Comment on Rule 63(10), at 171.
The statement by Rodriguez would not exculpate these defendants. When he allegedly struck at Flacco with a knife, as a defensive measure, Rodriguez "did not know if he hit him. He did not see any blood and the victim did not fall down, and made no sign of being wounded," according to Ganther's report. Rodriguez immediately ran out and took the knife with him. Such a declaration further lacks exculpation in view of Wilson's testimony as to the bloody butcher knife, capable of causing the mortal wound, and the testimony of the witness Garcia who heard Tapia say to Laboy during the progress of the fight, "Kill him. Kill him." Nor would it detract from the incriminating evidence of Garcia's testimony that he saw Tapia pass a knife to Laboy, who stabbed at Flacco twice and then "saw blood on the shirt [Flacco's]," and that Tapia, with the same knife, then stabbed Flacco in the left side of his breast.
In brief, the statement by Rodriguez was not of such an exculpatory character as to justify its admission into evidence under Evidence Rule 63(10), even were it not also properly excluded under the attorney-client privilege.

III
During the trial James Greene testified as a witness for the State. He witnessed the fight in question. He stated that he saw Flacco swinging a saw at three or four people in front of him. He identified Laboy as being there and standing with several others in front of Flacco. He asked Flacco what he was trying to do and Flacco said, "They are out to get me." Then he saw Laboy jab Flacco "with what I don't know." Flacco went back to the second or third stool from the end of the bar and then "collapsed."
Defendants contend that Flacco's statement to Greene was hearsay and it was, therefore, error for the court to permit the statement into evidence, over their objection.
*332 We find no error in the trial court's admission into evidence of Greene's recital of Flacco's declaration of a condition observed by him while he was "under the stress of nervous excitement caused by such perception, in reasonable proximity to the event, and without an opportunity to deliberate or fabricate." Evidence Rule 63(4). Flacco's statement was uttered spontaneously and contemporaneously with the fight. It explained his brandishing his carpenter's saw in defense against his apparent attackers armed with knives. The fact that the statement was in answer to a question does not deprive it of its spontaneity or make it any the less a part of the res gestae. See Riley v. Weigand, 18 N.J. Super. 66, 73-77 (App. Div. 1952). The statement was further evidence of the threat made a week prior when Laboy told Nola Link of his intent to "get" her husband, meaning Al, adverted to above. Then, too, the State's witness, Wilson, testified that Laboy struck the first blow and thereupon the fight ensued.

IV
Defendant's next point is that the trial court erred in denying their motion for a new trial. There were two reasons asserted in support of this motion. First, they argue that the verdict was against the weight of the evidence. Secondly, they aver that the acquittal of Rodriguez makes him now available for use at a new trial at which they would have access to vital evidence, not previously available when he was on joint trial. They would equate this newly available evidence with newly discovered evidence, albeit they knew of it before the former trial.
We shall dispose of the claim that the verdict was against the weight of the evidence under Point V, infra, where defendants iterate the same argument.
The "new evidence" alluded to is the report of the interview of Rodriguez by Ganther. But this evidence would still be subject at a new trial to the attorney-client privilege under which it was obtained. The availability of Rodriguez to *333 testify at a new trial, and his inability then to invoke the privilege against self-incrimination by reason of his acquittal of this murder charge, does not carry with it any assurance that he could not and would not invoke the same privileges again because of other charges which could be made against him, e.g., carrying a concealed weapon, or atrocious assault and battery, to name but two.

V
These defendants assert, finally, that the verdict was contrary to the weight of the evidence.
Our review of the trial transcript and the evidence satisfies us that it does not clearly and unequivocally appear that the trial court's denial of the motion for a new trial was a manifest denial of justice under the law. R. 2:10-1. State v. Forcella, 35 N.J. 168, 175 (1961), cert. denied 369 U.S. 866, 82 S.Ct. 1035, 8 L.Ed.2d 86 (1962); State v. Reyes, 98 N.J. Super. 506, 512 (App. Div. 1968), certif. den. 51 N.J. 582 (1968).
The judgments of conviction are affirmed.